EDWARD M. CHENEY AND MARIA J. CHENEY, APPELLANTS, VS. PETER JONES, COLLECTOR REVENUE DUVAL COUNTY, APPELLEE.

1. The courts will not declare the action of the Legislature unconstitutional, unless the violation of the Constitution is entirely free from doubt. To hold otherwise the Courts would be assuming powers of legislation, and creating constitutional provisions not before existing.

2. The second section of Article XII of the Constitution, providing that the Legislature shall provide for raising revenue to defray the expenses of the State, and also " to pay the principal and interest of the existing indebtedness of the State," and the seventh section which authorizes the Legislature to provide for the issuing of State bonds "for securing the debt," do not confine the power of the Legislature to the issuing of bonds for such indebtedness only as existed at the time the Constitution was adopted, but refer to any indebtedness " existing" and contemplated by the Legislature at the time it may act on the subject.

3. There is no limitation of the power of the State Legislatures as to the amount or objects of taxation, unless there be restrictions expressed or necessarily implied in the language of the Constitution on the subject.

4. Debts may be created under the authority of law, and the Legislature may levy taxes to pay them, or provide for issuing bonds to secure them and levy taxes to pay the principal and interest thereof.

5. The power of the Legislature of this State over the subject of issuing State bonds is limited by the provisions of the Constitution, because it has prescribed the several subjects and occasions for and upon which the Legislature may authorize their issue; and the legislative power over the subject of taxation is also limited, because the several purposes for which taxes may be levied are in like manner prescribed; the several purposes for which the Legislature may cause taxes to be levied being expressly named in the Constitution, and these purposes being sufficient for defraying the expenses of conducting the affairs of the government of the State.

6. An act of the Legislature authorizing the issuing of bonds to meet the future ordinary expenses of the State, and for which no indebtedness actually exists at the passage of the act, is not warranted by the Constitution.

7. Bonds not lawfully issued, but issued in fact for an indebtedness existing at the time of their issue, may be assumed and made valid by subsequent laws authorizing their issue. Such bonds are good from the date of their authorization, if the indebtedness for which they were irregularly issued remains unpaid.

8. An act of the Legislature authorized the levy of taxes (to pay the interest and for a sinking fund of bonds) whenever one-fourth of such bonds should be sold. It authorized the issuing of a portion of the bonds in exchange for and to secure former past due bonds, and another portion to be sold for cash: *Held*, that whenever one-fourth of the bonds were issued in exchange for the other bonds contemplated, they were *sold* within the import and meaning of the act, and the tax might be levied. But such tax could not be levied for the payment of the interest and sinking fund except to the extent that the bonds had been so issued.

9. When a bill is filed for the purpose of enjoining the collection of a tax on the ground that a portion of the tax is illegal, the bill must show to what extent the tax is illegal in order that the court may enjoin the illegal portion. Unless that portion of the tax claimed to be illegal be definitely shown by the bill, it can be enjoined only upon a future hearing, at which the court may be able to determine what portion should be enjoined.

Appeal from the Fourth Judicial Circuit, Duval County.

The bill in this case was filed for the purpose of enjoining the collector of revenue of Duval county from selling the complainants' lands for an unpaid tax levied under the provisions of the acts of 1871 and 1873, upon the grounds that the tax is not warranted by law on account of the un-

constitutionality of those acts. The bill alleges that at the close of the fiscal year ending October 31, A. D. 1867, prior to the adoption of the present Constitution in 1868, the indebtedness of the State was about $153,239.95, according to the report of the Comptroller, and that the " existing indebtedness of the State " *at the time* of the adoption of this Constitution, and not any subsequent indebtedness, was contemplated in sections two and seven of Article XII, for securing which the issue of bonds was thereby authorized ; or, as an alternative proposition, " that there must be a debt existing and ascertained at the time of the passage of any act by the Legislature authorizing an issue of bonds of the State, and that the amount of such bonds so issued, or authorized to be issued, must be confined strictly to the amount of the debt to be secured ; otherwise the issue is illegal, as not authorized by the said Constitution ; and that the amount of the State bonds aforesaid authorized to be issued, and for the interest and sinking fund of the whole of which a tax is assessed, greatly exceeded any unfunded debt of the State." And it is further alleged that the State bonds referred to " were not issued, or authorized to be issued, to secure any debt existing at the date of· the adoption of the Constitution, nor for the specific purpose of securing the debt, nor of erecting State buildings, nor of supporting State institutions, nor of perfecting public works."

It is further alleged that at the time of the passage of the act of 1873, the State of Florida was indebted to L. P. Bayne & Co., of New York, in the sum of $160,000, which indebtedness accrued after the adoption of the Constitution, and that they held $298,000 of the bonds of the State issued subsequent to such adoption, which had been hypothecated with them to secure their said claim ; and that the Comptroller pretends that he has negotiated and effected a sale of two hundred and fifty thousand dollars, of the bonds of the one million issued, to said Bayne & Co. at eighty cents on the dollar, when in fact Bayne & Co. had, in pursuance

of an agreement, taken from the State the bonds at eighty cents on the dollar in satisfaction and discharge of their claim.

It is further averred that said taxes have been levied for interest and sinking fund on all of said one million dollars of bonds, including those so delivered to said Bayne & Co., and those still unsold and in the hands of the Comptroller; and it is submitted and alleged that the interest on the bonds authorized to be taken up with the proceeds of the sale of the said issue of one million dollars of bonds, or any part thereof, has not been paid, and that no taxes can be legally collected on account of interest or sinking fund of the last mentioned bonds until they are sold.

The complainants pray a degree that the assessment and levy of taxes to pay the interest and to provide a sinking fund for the discharge of the principal is not lawful, and that the proceedings to enforce the collection thereof be enjoined.

Upon a motion for an injunction upon the bill filed, the defendant having appeared by counsel, the Circuit Court refused the injunction and dismissed the bill. The complainants appealed to this court, and say that the court erred in its several rulings and in dismissing the bill.

*H. Jenkins, Jr.,* for Appellants.

The points of fact relied upon for relief, and claimed to be established by the bill and exhibits, are:

1. That the tax complained of is levied upon the complainants' property in Duval county.

2. That the said tax is levied to pay the interest and provide a sinking fund of the bonds of the State of 1871 and 1873.

3. That the said property has been advertised to be sold by the defendant to satisfy the said tax.

4. That the seventh section of Article XII of the Constitution of the State does not contain the words "of the

State," following the word " debt," as printed in the published instrument.

5. That the debt existing at the date of the Constitution, for which no provision had been made, is shown by the Comptroller's report for the fiscal year ending October 31, A. D. 1867, to be $153,239.95.

6. That the amount of the bonds, for the payment of the interest and to provide a sinking fund of which the tax is assessed, greatly exceeded the unfunded debt of the State at the time they were issued.

7. That the said bonds were not issued or authorized to be issued to secure any debt existing at the date of the Constitution, nor of erecting State buildings, nor supporting State institutions, nor perfecting public works.

*Points of law—Construction of the Constitution.*

1. The words, "the debt," found in the Constitution. Art. XII, sec. 7, should be interpreted to refer only to the debt of the State at the date of the Constitution, the debt that might be created for the erection of State buildings, in support of State institutions and in perfecting public works. 1 Sto. on Const., 921, 922, 930.

2. The words of a Constitution are presumed to have been used with the greatest possible discrimination. 3 Sel., 97 ; 9 Wheat., 188.

3. " The plain and literal meaning of the language of a Constitution should never be departed from, unless there be strong evidence that the meaning of those who framed the instrument was different from that which its language imports." Story on Const., secs. 320, 451 ; 24 N. Y. Rep.. 487, 504.

4. The Constitution of the State limits the power of the Legislature to issue bonds of the State, by necessary implication, to the purposes of securing the debt existing at the date of the Constitution, of erecting State buildings, of supporting State institutions, and of perfecting public works.

Art. XII, sec. 7, Const.; 15 N. Y., 543-5-6, 558; 3 Seld., 97, 109, 114, 119, 121; 4 Hill, 144; 9 Wheat., 188.

5. An affirmative grant of special powers restricts the general authority of a Legislature to the particulars specified. 1 Sto. on Const., secs. 448-9; 13 Mich., 158; 7 Iowa, 275, 277.

6. When a Constitution specifies the purposes for which a power may be exercised, the specification is an implied prohibition against the exercise of the power for any other purpose. Cooley's Con. Lim., 64; 4 Md., 189; 5 Wis., 308.

7. Constitutional prescriptions are mandatory. Cooley's Con. Lim., 78, 150.

8. The act of the Legislature authorizing the issue of the bonds of 1871 is repugnant to the letter and spirit of the Constitution, inasmuch as it authorizes the funding of the debt to be incurred for expenses of the State to accrue in the ensuing year in bonds running for a term of years. Art. XII, sec. 2, Const.; Act Jan'y 26, 1871.

9. The act authorizing the issue of bonds of 1873 is repugnant to the letter and spirit of the Constitution, inasmuch as it authorizes the sale of the bonds to pay the current expenses of the State. Act Feb'y 21, 1873; Art. XII, sec. 2, Const.

10. The levy of taxes to pay the interest and provide a sinking fund of bonds not issued, but only authorized to be issued, is arbitrary and unreasonable.

11. " The power of taxation which the people have delegated to their government is not an arbitrary one, but limited by the words and spirit of the Constitution and the principle of natural justice." Blackwell on Tax Tit., sec. 4.

12. When there is ambiguity in any clause of a Constitution, extrinsic aids may be used to construe it. Cooley's Con. Lim., secs. 55, 65, 67, et seq.; 5 Md., 471; 7 Iowa, 262; 13 Mich., 147.

13. " In construing the language of a Constitution, the courts have nothing to do with the argument *ab inconve-*

Cheney and Wife v. Jones.

*nienti,* for the purpose of enlarging or contracting its import." 21 Wend., 563 ; 7 N. Y., 9, 109.

14. Contemporary and practical construction of a Constitution have little weight when the language is plain, and the people have plainly expressed their will in the Constitution. Cooley's Con. Lim., sec. 71 ; 17 Ohio, 446.

15. The condition.precedent in the act of Feb'y 21, 1873, providing that " no tax shall be levied until one-fourth of the bonds are sold," was not complied with before the tax for the payment of the interest and to provide a sinking fund for the redemption of the bonds authorized by that act to be issued was levied. Act Feb'y 21, 1873.

If the law of 1873 authorizing the issue of bonds is not unconstitutional, then the assessment of three mills for interest and one mill for sinking fund of all the bonds as taxes is illegal, as in violation of the intention of the Legislature expressed in the law. Act Feb'y 21, 1873.

*II. Bisbee, Jr.,* for Appellee.

The State Legislature has power to make laws at discretion, subject only to restrictions imposed by the Constitution of the State and of the United States. Cooley's Con. Lim., 87, 168 ; 15 N. Y., 543.; 27 Vt., 142 ; Sedg. on Stat. and Com. Law, 184-5-6-7.

" Where the Constitution *is silent,* and there is no clear usurpation of the power distributed to other departments, I think there would be *great danger and difficulty* in attempting to define the limits of this power." (Opinion of Comstock, J., 13 N. Y., 391.)

" Where the Constitution has given a list of the things the Legislature *may not do,* the judiciary cannot extend it." 21 Penn., 146, 162 ; Sedg. on Stat. and Com. Law, 186.

" A State Legislature has jurisdiction of all subjects on which legislation is not prohibited." 15 N. Y., 303 ; 24 ib., 497 ; 4 Mich., 244 ; 18 Ind., 258 ; 17 Cal., 547 ; 17 Penn. St., 119.

A statute cannot be declared void because, in the opinion of the Court, it is opposed to the spirit of the Constitution. Cooley, 171; 24 Wend., 220; 20 ib., 381, 383; Sedgewick, 186; 21 Penn., 147, 162.

"A statute may be constitutional, and its taking effect may be made to depend upon some subsequent event." Cooley, 118; 7 Cranch, 382; 13 Grat., 78; 26 Vt., 357; 17 Ohio N. S., 271; 29 Md., 85.

It is submitted that there is no prohibition in the Constitution against issuing bonds to pay or secure any debt of the State, and that that instrument is not susceptible of such a construction, without a departure from rules settled by a long current of decisions.

Whether or not the one-quarter of the bonds issued in 1873 have been sold, within the meaning of the law, is a mixed question of law and fact, and must be determined from the allegations in the bill.

The bill alleges that the State was indebted to L. P. Bayne & Co. in a large sum of money, but submits that a sale to L. P. Bayne & Co. of the bonds of 1873, at the price authorized, and paying said indebtedness authorized from the proceeds of said bonds, was not a sale for cash within the meaning of the law, while the appellee submits that it was.

*Cooke, Attorney General*, for the State.

This case arose from an application to the Judge of the Circuit Court of Duval county by Edward M. Cheney and Maria J. Cheney to restrain Peter Jones, collector of revenue for the State of Florida and county of Duval, from collecting the tax authorized to be levied by the Comptroller of the State under the revenue laws of 1873.

The appellants allege that by the third section of the XIIth Article of the Constitution of the State of Florida, it is declared that "no tax shall be levied except in pursuance of law."

This is true, and the question presented by the bill asking for an injunction against the tax collector is that the Constitution is violated by the acts under which the revenue is proposed to be collected.

The true legal question presented by the bill is not embraced in the above quoted clause of the State Constitution, which simply says that no tax shall be levied *except in pursuance of law*. It is not claimed by the appellants that the levy is illegal, for it is not denied by the appellee that taxes can be collected otherwise than in pursuance of law.

The tax collector has not violated the law. He has, as far as it appears from the papers on file in this cause, pursued the law, and if he has pursued the law in making a legal levy, then this constitutional objection falls to the ground. The tax collector is merely an executive officer required to levy for the amount he is required to collect.

The appellants allege in their bill that the taxes so assessed and levied are dependent on a right, the validity of which is against the Constitution of this State. Examine the manner in which they present this point and it is as follows :

1. That the taxes are being levied at the rate of forty cents in every one hundred dollars of the assessed value of the said property for the general sinking fund and interest for bonds of 1873, and also fifteen cents on every one hundred dollars of the said value of said property for the bonds of 1871.

It is alleged in the bill that the bonds of 1871 means an issue of bonds under the act of Feb'y 26, 1871, and that according to that statute, " the bonds issued were not to exceed the sum of three hundred and fifty thousand dollars."

There is nothing illegal in the process of the levy or the instructions of the Comptroller set forth in the bill. See act of Feb'y 26, 1871, sec. 7, p. 14.

The assessment and levy is to be taken as done in conformity to law, unless the illegality thereof is charged in

the bill, which is not done, and if done, the manner must be set forth and the facts proven as alleged.

Then it is stated that the bonds of 1873 "were an issue of bonds of the State to an amount of one million of dollars authorized to be executed and issued by another act of the said legislative department passed Feb'y 21, 1873." This is true. See act of Feb'y 21, 1873.

We present now a legal objection set up by the bill of the appellants, and it is certainly destitute of force. It is, "That the legislative department was not authorized to provide for the issue of any such bonds; it was on the contrary prohibited by the Constitution of said State from exercising any such power, and the bonds so issued under color of the said legislative acts were, therefore, wholly illegal and void of obligation."

Upon what constitutional basis is the said objection made? It is this: "That the 7th section, Article XII, of the said Constitution, which confers the power of providing for the issue of bonds for certain express purposes upon the legislative department, reads correctly as follows, to-wit: 'The Legislature shall have power to provide for issuing State bonds bearing interest for securing the debt, and for the erection of State buildings, support of State institutions and perfecting public works,' and not as printed in the Constitution: 'The Legislature shall have power to provide for issuing State bonds bearing interest for securing the debt *(of the State)* and for the erection of State buildings, support of State institutions and perfecting public works.'"

It is true that the 7th section, XIIth Article, of the Constitution of this State has the words "of the State" enclosed in brackets, as cited in the second quotation just made; and it may be true that the words "of the State" are not in the enrolled copy of the Constitution in the office of the Secretary of State, but it does not appear from any evidence on file; but admit it, as an allegation in the bill not denied, for it appears that the State was not represented in the

Cheney and Wife v. Jones.

court below, and that the bill was not answered on the part of the State, simply a motion for an injunctive order being made, under which the court refused the order and dismissed the bill.

This question of the interpolation of the words " (of the State)" is of so little importance that it needs no consideration, for strike it from the Constitution—from a personal inspection of the enrolled Constitution of 1868, I am ready to admit that the words (of the State) are not in the original—and it avails nothing in the argument of this cause in favor of the appellants.

The interpolation of the printer, or any one else, can have no effect on the original paper. This is a principle well recognized in our courts in reference to the alteration of legal documents.

Then take the sentence as it reads in the Constitution, with the words in brackets left out; and it reads that " The Legislature shall have power to provide for issuing State bonds, bearing interest, for securing the debt." Here I ask what debt ? Evidently of the State, for the Legislature could secure no other debt. Then how is the logical connection kept up that the meaning of this clause in the Constitution was applicable to the functions of the Legislature in reference to the State debt ?—by continuing the reading of the same clause which goes on to say, without even a comma, " and for the erection of State buildings, support of State institutions and perfecting public works."

Now the meaning of this clause taken in its continuity is so obvious that I desist from further remarks thereon.

The bill as it progresses raises this point next in order :

" That there must be a debt existing and ascertained at the time of the passage of any act of the Legislature authorizing an issue of bonds of the State, and that the amount of such bonds so issued, or authorized to be issued, must be confined strictly to the amount of debt to be secured."

18

The Constitution says :

" The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State." Art. 12, sec. 2.

Take the first act under which the bill raises any objection to the levy, the act of the 24th of January, 1871. It says, " That for the purpose of funding the *floating indebtedness of the State*," the Comptroller shall cause to be prepared, &c., the aggregate amount of bonds not to exceed the sum of *three hundred and fifty thousand dollars.*

Now in this instance the Legislature had before it the evidence of the floating debt of the State, and it decided that it was three hundred and fifty thousand dollars, and authorized the Comptroller to issue bonds up to that amount, which was the principal and interest of the existing indebtedness of the State at that time. At all events, such was and such have been the decisions of the Legislature, and in the absence of all authority upon the subject, the court has no authority to go behind the act of the 26th of January, 1871. In reference to the levy of fifteen cents on every one hundred dollars, it is a local assessment applicable to each county which the Comptroller has a right to order under the statute of 1871. See statute of January 26th, 1871, sec. 7, page 14.

The bill further seeks to stop the collection of taxes for the payment of the interest on the bonds of 1873 for the same reasons. Examine this objection as to the one million issue of bonds. The act of 1873 adopts as the basis of the indebtedness of the State one million of dollars, which was the then existing indebtedness of the State. This is said upon the authority of the law itself, which says : " For the purpose of *funding the present indebtedness of the State*, the Comptroller shall cause to be prepared coupon bonds to the amount of *one* million dollars." See act of 21st of February, 1873, sec. 1.

The bill further assumes that the Legislature violated the Constitution of this State by not confining its power to funding the debt to the exact amount of the existing debt at the date of the adoption of the Constitution.

Examine this section and see wherein consists its logical force. Is it that the Constitution does not allow the Legislative Department to issue bonds for the purpose of funding a debt unless that debt was created before this Constitution was adopted, or in existence at the time, which naturally presupposes that it was created prior to the Constitution? Such position is not sustained by the letter or the spirit of the Constitution. Indeed, would it not paralyze the arm of the Legislative Department and suppress the functional exercises of every branch of the government?

The Constitution of the State of Florida says: "The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal and interest of the *existing indebtedness* of the State." Art. XII, sec. 2.

This language of the Constitution is sufficiently explicit, and perhaps so lucid as to be beyond the power of learned counsel to render its meaning obscure. Why confine the term "existing indebtedness of the State" to an indebtedness at the time of making the Constitution? If from any cause, and it cannot be denied that from various causes the revenue provided for the expenses of the fiscal year has failed to be sufficient, is there not then left an "existing indebtedness of the State?" And is it not made a duty under the Constitution for the Legislature to provide in the very terms of the Constitution from which I quote, "*a sufficient sum to pay the principal and interest of the existing indebtedness of the State?*"

What is the existing indebtedness of the State? Surely the indebtedness thereof at any time that a legal debt exists, and that the debt did exist at the time of the passage of the two acts under consideration by the Legislature is sufficiently

proven by evidence before the court, and from the very voice of the Legislature uttered in the acts in giving the Comptroller authority to issue the bonds. On this point, see acts of 1871, '73.

We should give a rational as well as practical construction to the Constitution in reference to the taxing power of the government. Especially in an instance like the one under consideration, should we adopt the logic conveyed in the language of our eminent jurist Cooley, who says, " We are not to import difficulties into a Constitution by a consideration of extrinsic facts which have appeared on its face." Cooley Con. Lim., p. 65, 1st ed.

The XII Article of the Constitution relates entirely to taxation and finance; providing a uniform and equal rate of taxation, and also to the means and method of paying the debt of the State.

Taxation is the means; the method used by the Legislature is the constitutional way for raising taxes; and the plan adopted for the use of these means is by the issuing of bonds according to the legally prescribed method or plan under the Constitution. If there are limitations to this method under the Constitution, it is not denied that the Legislature is bound to confine the exercise of its power within the bounds of this limitation. But it is apparent that the bill of the appellants does not show in manner or form wherein the Legislature has departed from the most rigid requirements of the Constitution.

It is difficult to construe away a constitutional power to be exercised by the Legislature, even when this power is involved in the exercise of implied power, much less of an absolute grant of power. Cooley even goes to this extent and very justly as well as logically says:

" We have elsewhere expressed the opinion that a statute cannot be declared void because opposed to a supposed general interest or spirit, which it is thought . pervades or lies concealed in the Constitution, but wholly unexpressed, or

because, in the opinion of the court, it violates fundamental rights or principles, if it was passed in the exercise of a power which the Constitution confers. Still less will the injustice of a constitutional provision authorize the courts to disregard it or indirectly to annul it by construing it away." Cooley Con. Lim., p. 72–3.

It is now the duty of the court to notice two other points made in the bill of the appellants. Before proceeding to notice them, however, it is apparent that the case now before the court comes up on an appeal from an order of the Circuit Court of the fourth Circuit refusing to grant an injunction upon the face of the bill. The facts are not denied; and upon the failure of the State through the attorney by whom it was represented in the court below, if indeed the State was represented, there is no means offered to the State now in the Supreme Court to deny the truth of the allegations on which the equities of the case rested and which must have controlled the decision of the court below. Then the two vital points on which the case rests are upon the legal and equitable force of alleged facts on the one hand, and their being undenied on the other.

1st. The first point then under these undenied allegations in the bill is, as the bill charges, " That at the time of the issue of the said one million of dollars of State bonds, the State of Florida was indebted to one L. P. Bayne & Co., Bankers in New York, in the sum of $160,000, which indebtedness accrued after the adoption of the said Constitution of Florida, and to secure the payment of said indebtedness the said L. P. Bayne & Co. held $290,000 of the bonds of the State of Florida, issued subsequent to the adoption of the said Constitution, which had been hypothecated with the said L. P. Bayne by the State to secure said debt. *That the Comptroller of said State pretends* that he had negotiated and effected a sale of $250,000 of the bonds of the one million issued aforesaid, to said L. P. Bayne & Co., at 80 cents on the dollar, in payment of said indebtedness, and in

pursuance of such agreement said indebtedness was discharged."

The bill admits that if said Comptroller had received the cash for said bonds from Bayne & Co. he would have been authorized by law to pay it over. In other words, the bill makes the point that the bonds were never sold according to law. It is evident from the 10th section of the statute of 1873 what bonds can and cannot be exchanged, and if the court will look into the transaction as it appears from the records of the State showing the contract between the Comptroller and Bayne & Co., made at Jacksonville, April 10th, 1873, it will learn the character of the *exchange* made with Bayne & Co., and whether it was a sale or exchange, and how far it complied with the act under consideration. See second annual message of Gov. Hart, January 6, 1874, with accompanying documents, pages 31, 32.

This point I leave to the consideration of the court as made by the bill. The law makes provision by the said 10th section for the exchange and redemption of five hundred thousand dollars of bonds previously authorized to be issued, with a specification of what outstanding bonds of the State are not to be exchanged ; and here is the validity of the point indicated in the bill and in this brief, marked 1.

2d. Then the other point of law upon facts undenied is whether the Comptroller is authorized, under the said act of February 21, 1873, to levy a tax for the payment of the interest and for a sinking fund for an excess of the bonds over and above the amount sold. The law says, "No tax shall be levied until one-fourth of the bonds are *sold*." See act of February 21st, 1873, sec. 5, p. 13. The expression is not "*exchanged*," but "*sold*," and as it will be seen by reference to the 10th section, a distinction is made between what bonds can be exchanged and what cannot be, and it is that class which cannot be exchanged that can be sold. See 2 Parsons on Contracts, p. 436, chap. 4, sec. 11, 2d Boston edition.

Then the question arises as made by the bill, what amount of tax should be levied—an amount to meet principal and interest of the million of dollars of bonds whether sold or not, or to meet the payment of the amount the State owed on its bonds? which amount due could not exceed the amount of bonds sold, for the simple reason that bonds of the State authorized to be sold by the Comptroller create no debt on the part of the State until sold. Did the law contemplate the levying a tax to pay the interest, and also of a certain amount to go into a sinking fund to pay principal and interest on a debt not in existence? By the terms of law all bonds remaining unsold under this act at the expiration of one year from the passage of this act shall not be sold until further legislative action. The expiration of this one year was on the 21st of February, 1874. See sec—, p. 12, acts of 1873.

These bonds, such as are exchanged or sold, are to run thirty years from date. Let the tax for the million bonds be levied for thirty years to pay the principal and interest on what is the amount sold, not for the amount sold and unsold, how would the money raised by taxation on the unsold bonds be applied, no principal or interest being due thereon, and no debt created for the liquidation of which the sum raised by taxation could be applied?

In concluding this argument, I here take occasion to say that I make no attack on the position of the officers of the State connected with this transaction, but have endeavored to present the law as applicable to this case, considering that the State, which means the people of the whole State, is more interested in an accurate legal termination of the matter herewith connected than any views which some of the representatives of the State might entertain, let them be ever so honest and sincere for the common good of us all.

If the bill of the appellants is untrue, it was the duty of the Comptroller to come in and ask to be made a party and to deny under oath the allegations of the bill. Has he not

by not appearing acknowledged that he did not consider the State as interested ?

If the bonds authorized to be sold and exchanged under the act of 1873 had all been sold or exchanged before the 21st of February, 1874, which was required by act of that date, then the levy for the whole amount of interest would be lawful, *and not until then.* That they had not been sold or exchanged before the 16th of February, 1874, nearly the period of the expiration of the time at which they could have been disposed of, I feel satisfied in holding the affirmative, by reference to the following act approved February 16, 1874, which authorizes an extension of the time for which they can be *exchanged, not sold.* See acts of 1874, p. 32.

This bill and the points presented for the consideration of the court apply to the levy under the assessment for 1873. Yet I ask leave to call to the attention of the court the 32d section of the act of 1874 for the assessment and collection of revenue :

" For the purpose of securing an equal and uniform rate of taxation, there shall be annually levied upon the real and personal property of the different counties a tax of seven mills to pay the appropriations made by the Legislature for each year, and a tax of one mill for school purposes, and a tax of three mills to pay the interest on and for the ultimate redemption of the State bonds of 1873, and such tax to pay interest upon and form a sinking fund for the redemption of the bonds of 1871 as is provided by Section 7 of Chapter 1,833, Laws of Florida, passed January 26, 1871."

Now this does provide for the bonds of 1873, but it cannot allude to the bonds not sold, for bonds created by the State payable to bearer, but unsold, are in no legal sense bonds, any more than would my writing a bond purporting to pay to A. a sum of money, which bond, instead of being delivered, I had locked up in my desk and never delivered it.

Taking a full, fair and calm survey of the points of law

presented in this case arising from the face of the bill, and nothing has been denied, what is presented to the court? Three points of law :

1st. A construction of the Constitution as to the power of the Legislature to issue bonds for the purpose of paying the indebtedness of the State. This point of law I have argued.

2d. As to what is a sale, and what an exchange of the bonds alluded to in the act of 1873.

3d. Whether a tax can be levied to pay the principal and interest of State bonds not sold. As to the facts of the 2d and 3d points it may not be for the court now to inquire ; they were not denied in the court below and must in a legal sense be taken *pro confesso*. Then I would ask the court to sustain the bill upon these two points, were it not for these objections :

1st. The case is not fully made out so as to enable this court to make a full and final decision as to the sale and exchange of bonds.

2d. The points contained in the bill, even if it is entertained, are not of sufficient weight to decide the matters of law in which the State feels a great interest—not the legality alone of the levy made by the Sheriff of Duval county, but the legality of the assessment of 1873 for the payment of the interest and principal of the bonds of 1873.

Then the case should go back to the court below with directions to amend the bill so as to make the Comptroller a party and allow him to answer and file such exhibits as will bring this case before your honors in that complete condition which will ensure a decision worthy of the great principles here involved.

RANDALL, C. J., delivered the opinion of the Court.

Article XII, section 2 of the Constitution of Florida, reads as follows : " The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for

each fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State."

" Section 7. The Legislature shall have power to provide for issuing State bonds bearing interest, for securing the debt, and for the erection of State buildings, support of State institutions, and perfecting public works."

The Legislature in 1871 (Chapter 1833) enacted, " That for the purpose of funding the floating indebtedness of the State, the Comptroller shall cause to be prepared thirty-year seven per cent. coupon bonds, that is to say, bonds of the State of Florida due and payable thirty years from the date thereof, bearing interest at the rate of seven per cent. per annum, equal to the amount of Comptroller's warrants and Treasurer's certificates now outstanding, and ·to be issued prior to the first day of January, A. D. 1872.; provided, that the aggregate amount of bonds issued by authority of this act shall not exceed the sum of three hundred and fifty thousand dollars."

The act further provided for the levy of a tax of a sufficient sum to pay the interest, and one. per cent. of the principal as a sinking fund, annually, upon the amount issued.

In 1872, the Legislature passed a further act in reference to the issuing of these bonds, which act will be hereafter referred to. (Chapter 1,889.)

In 1873 the Legislature passed an act providing for the issue of one million dollars of bonds, with interest payable semi-annually in gold, at the rate of six per cent. per annum, and provided for levying a tax annually of three mills upon the dollar of the assessed valuation of property to pay the interest, and a tax of one mill for the creation of a sinking fund for the ultimate redemption of the bonds; and that no tax shall be levied until one-fourth of the bonds shall be sold. The act required the Comptroller to hold five hundred thousand dollars of such bonds for the purpose of exchanging for and the redemption of the valid bonds of the

State, and to exchange such bonds for a like amount of the principal and unpaid interest of the bonds to be redeemed. But the bonds held by the Seminary and School Fund, the $350,000 of bonds issued under the act of 1871, the bonds issued in aid of railroads, and bonds of 1868 and 1869, which were hypothecated in New York or elsewhere, were not to be so exchanged.

The remaining $500,000 of said bonds were directed to be sold for United States currency at not less than eighty cents on the dollar; and out of the proceeds of the sales the Treasurer should, first, pay the amount necessary to redeem the bonds of 1868 and 1869 from hypothecation, and next, pay the indebtedness of the State accruing after the first day of July next ensuing. Laws of 1873, Chapter 1,937.

I. The first question that is presented is this: Does the Constitution authorize the Legislature to provide for issuing bonds of the State to pay any indebtedness (other than "for the erection of State buildings, the support of State institutions, and perfecting public works,") unless such indebtedness had been incurred, or existed at the time the Constitution was adopted?

No rule of constitutional construction is better settled than that if there be a doubt whether a legislative enactment is strictly constitutional, or that if it be not clearly opposed to constitutional restrictions, the courts will not hold the enactment to be invalid. If the courts were to hold otherwise they would become mere law-makers, undertaking to place obstacles in the way of legislation which had not been plainly placed there by the people in framing the charter itself, and deny to the people represented in the Legislature a power they had not denied to the legislative department.

The Legislature is authorized to raise revenue, that is, levy and collect taxes sufficient to defray the expenses of the State for each year, and also a sum to meet the principal and interest of existing indebtedness. If, as contended by the appellant, it was intended that the "existing indebted-

ness" referred to included only such indebtedness as existed at the time of the ratification of the Constitution, it would have been made entirely clear if it had been so expressed. But it is not so expressed. If it had been written that the Legislature should provide for paying the debts of the State " existing at the time the Constitution is ratified," or equivalent words, there would have been no cavil as to its meaning. That States become indebted from various causes, from extraordinary occurrences, from local or general misfortune, war, pestilence, and famine, beyond the present or immediate means of paying, and for expenditures not strictly included in the terms " expenses of the State," is matter of history in the career of every country. And the occurrences of the few years past, the organization of the government upon new foundations, the misfortunes and poverty of the people, and various causes within the knowledge and recollection of every adult person in this State, afford ample sources for the conclusion that the framers of the Constitution must have anticipated that the expenses of the reorganization of the State and all its municipal divisions would be much greater than could be conveniently borne at the moment of their creation. But what does the language used imply? The Legislature is required to meet annually, and then make provision at their annual sessions for " defraying the expenses of the State," and for " paying the principal and interest of the existing indebtedness." Most surely it contemplates the indebtedness in " existence" at the time of the annual session of the Legislature. If the law should require every man in the State each year to provide for paying his " existing indebtedness " and the interest upon it, could it be seriously insisted that this referred only to his debts existing at the time of the enactment of the law? And yet this is but the import of the language of the Constitution in regard to State indebtedness.

The framers of the Constitution, foreseeing the necessities of the times, and well knowing that the revenues might of-

ten be insufficient to keep the State out of debt, and that enhanced taxes to supply deficiencies would be sometimes oppressive and burthensome, provided that State bonds might be issued to secure the ultimate payment of such indebtedness as might " exist." It is a permanent, continuing provision, and not couched in such language as would confine its operation to the debt existing before its adoption. Constitutional provisions intended to operate upon some isolated or peculiar transaction are usually inserted among " miscellaneous provisions" or ordinances ; but this is placed in the . chapter or article referring to the current financial transactions of the State. The language is : " The Legislature shall have power to provide for isuing State bonds, bearing interest, for securing the debt," &c. And here we find no language which confines its operation to any transaction or indebtedness antedating the Constitution.

The provision relating to the militia of the State, that " all able-bodied male inhabitants of the State, between the ages of eighteen and forty-five years, who *are* citizens of the United States, or *have* declared their intention to become citizens · thereof, shall constitute the militia of the State," obviously intended to include all who were inhabitants at the time of the adoption of the Constitution, and also those who should subsequently become inhabitants and citizens ; and yet the language used refers quite as clearly to those only who were *then* inhabitants, as do the sections of the article upon finance refer to the *then* existing indebtedness. The usual and natural interpretation of the language must control, and always with reference to the subject-matter and the evident objects and purposes of its employment.

It is urged that the provisions referred to apply only to such indebtedness as may have existed at the date of the Constitution. If so, it must have been contemplated by the framers of that instrument that without such express authority it was doubtful whether the State to be organized under it would be liable for the debts of the former government,

and.that such a provision was proper in order to remove such doubts and to assume such debts as though they were the debts of another government.

But it has been established upon high judicial authority, that as to the State governments there is no limitation upon the power of the Legislature as to the amount or objects of taxation; that the interest, wisdom, and justice of the legislative body, and and its relation with its constituents, furnish the only security against unjust and excessive taxation, unless there be express restrictions upon that power in the Constitution. (Prov. Bank vs. Billings, 4 Peters, 514; Brewster vs. Hough, 10 N. H., 138; Mack vs. Jones, 1 Foster, N. H., 393; McCulloch vs. Maryland, 4 Wheaton, 316; Blanding vs. Burr, 13 Cal., 343.) And if the provisions of the second section of Article XII refer only to the prior indebtedness of the State, and were inserted for the purpose of removing doubts as to the liability of the present government for such debts, it must be construed as a special authority to pay them, and in that case there is no element of restriction to be implied from it as to other subjects.

The second section, it will be observed, has no reference whatever to the issue of bonds, but only to the subject of paying the current expenses of the State and the principal and interest of existing indebtedness. The seventh section refers to the issue of bonds to "secure" indebtedness. And *when* may such bonds be issued? The provision contains no direction upon the subject, and the Legislature may act on the occasion of its first meeting, or the tenth or the twentieth. And what then is its duty? If the State owe a million of dollars at the end of ten years, and owed but half a million at the beginning of the first year, has it no power to "secure" the debt due at the end of ten years? The Constitution contains no suggestion that the State must repudiate its debts incurred in pursuance of the authority of the Legislature; and it must pay or repudiate. Common honesty is quite as respectable on the part of the State as in

Cheney and Wife v. Jones.

an individual, and hence the State will be honest and not repudiate. But the debt is perhaps too much to be paid by our people at once, and they may prefer to pay in instalments with interest. And what is a State bond but a *promise* to pay the principal and interest of its debts, equally binding upon us, whether it be in the form of a bond or an open indebtedness?

The proposition made by the complainant is that taxes cannot be levied except to pay the principal and interest of indebtedness existing at the date of the Constitution, and to meet the current expenses of the State, and to pay for State buildings, and the support of " State institutions." And so the question arises, can the Legislature create a debt without violating the Constitution? If not, then we must pay our taxes into the Treasury in advance to meet current expenses; for, if this be not done, an indebtedness must follow the issuing of every warrant upon the treasury, if there is no money in the treasury at the moment.

We cannot sanction any such absurdity as that valid debts may not be created under the authority of law, and that the Legislature cannot levy taxes to pay the principal and interest thereof; (other than debts existing in 1868, when the Constitution was adopted, and debts incurred " for the erection of State buildings, and support of State institutions;") and it seems to us very plain that if the State owes a debt at any time, the Legislature may provide for paying it by the levy of taxes. The issuing of bonds does not create a debt, but is simply a means of securing the future payment of principal and interest, and the Legislature may authorize the issue of bonds for that purpose, whenever a debt has been incurred.

II. The question next arises, whether the Constitution authorizes the issuing of bonds of the State for the purpose of securing any indebtedness not yet actually incurred, or for the purpose of raising money by a sale thereof to pay the

ordinary expenses of the State ; and do the octs of 1871 and 1873 provide for the issuing of bonds for such purposes?

We have already seen that the general grant of legislative power carries with it by implication and construction all the means necessary for its due execution, and that there is no limitation upon the power of the Legislature as to the amount or objects of taxation, unless such restriction is expressed or necessarily implied from the fundamental law.

Were there no prescriptions in the Constitution of the several objects or purposes for which the Legislature may impose taxes, there would be no limitation upon the power except in the wisdom and discretion of the Legislature. And it is not necessary that a limitation of power should be framed in express terms. If a power is granted to do certain things, as for instance, the levying of taxes for certain specified and enumerated purposes, and it is not *essential* to the carrying out of the purposes of the government that any such power should be exercised except for the purposes specified, the effect of such prescriptions is equally prohibitory as to the purposes not specified as though the prohibition were declared in affirmative terms. (See Cooley's Con. Limitations, 64, 87, 176 ; People vs. Draper, 15 N. Y., 543 ; Stewart vs. Supervisors, 30 Iowa, 9 ; Twitchell vs. Blodgett, 13 Mich., 127, 158 ; Sharpless vs. The Mayor, &c., 21 Pa., St. Rep., 147 ; 1 Story's Com., Sec. 448.)

Measuring the power of the Legislature by the terms of the Constitution in respect to the levying of taxes, we find that it is permitted " to raise revenue sufficient to defray the expenses of the State," (which includes such expenditures as may be authorized by the Legislature and which are not prohibited by the Constitution,) and " to pay the principal and interest of the existing indebtedness of the State."

This provision is so broad that we cannot conceive it to be necessary to the due exercise of all the powers of government to travel outside of it for any legitimate object. It erects a boundary also, which we think was intended to pro-

Cheney and Wife v. Jones.

tect the people from errors which sometimes have been committed by Legislatures. It prescribes what may be done, how far the Legislature may go in levying taxes ; and upon the principles alluded to, it is a limitation not wanting in directness to amount to a prohibition. And as to the power to issue bonds of the State, it says, " the Legislature shall have power to provide for issuing State bonds bearing interest for *securing* the debt," &c. ; and by the same rule, founded in principle and sustained by authority in unbroken currents, it is equally prohibitory as though it should declare that " the Legislature shall have no power to provide for the issue of bonds except for *securing* the debt," &c.

The Legislature in 1871 (Chap. 1833) passed an act providing that " for the purpose of funding the floating indebtedness of the State," the Comptroller should cause to be prepared bonds not exceeding the amount of $350,000, bearing interest at seven per cent., equal to the amount of Comptroller's warrants and Treasurer's certificates now outstanding *and to be issued prior to the first day of January*, 1872, and further authorizing the Comptroller to exchange said bonds for said Comptroller's warrants and Treasurer's certificates at par. A tax was also authorized sufficient to pay the interest and to provide a sinking fund for the ultimate redemption of the principal.

On the 15th February, 1872, another act was passed (Chap. 1889) authorizing the Comptroller to issue the bonds of 1871, not yet issued, for the purpose of taking up Comptroller's warrants issued on and after January 1, 1872.

Was this act of 1871 authorized by the Constitution? From the principles already laid down, we must hold that so far as the act authorized the issuing of bonds to secure any indebtedness, which had accrued up to the time of its passage, it was authorized by the Constitution ; and so far as it authorized the issue of bonds at a future time, in exchange for any indebtedness not yet incurred, and growing out of

the ordinary expenses of the State, it was not in accordance with the provision of the Constitution.

A law may be constitutional in part and unconstitutional in part, as it may be in part within the scope of constitutional authority and in part outside of it, if a part of the law can be executed without the aid of that part which is invalid. (See Cooley's Const. Lim., 177, and authorities cited.)

It does not appear, however, from the bill that the outstanding floating indebtedness was less than three hundred and fifty thousand dollars. The act says "not exceeding" that amount may be issued for the purpose of funding the floating indebtedness of the State; and it must be presumed that the Legislature, in authorizing the exchange of these bonds for State warrants issued prior to the ensuing January, referred to warrants to be issued for such indebtedness as *had been* incurred at the date of the act, whether warrants had yet been issued therefor or not.

The act of 1872 is of equal validity with the act of 1871, so far as it authorized the issuing of the bonds provided for by the latter for any actual indebtedness, and so far as the bonds mentioned in these acts were issued to secure any indebtedness which had been incurred up to the 15th of February, 1872, when the act of that date was approved, we cannot hold that they were unauthorized by the terms or the spirit of the Constitution.

We do not mean to say that an act which is unconstitutional, or any thing done in pursuance of such act can be ratified and made valid by subsequent legislation. This is not the purpose of the law of February 15, 1872, but so far as the law of 1872 authorized the issuing of the bonds of 1871 for any indebtedness which had been incurred at the date of its enactment, it is valid, and the bonds which had been issued up to that date for indebtedness then accrued were from that date good, because they were then authorized by law to be issued.

III. The act of 1873, (Chap. 1,937) authorized the issue of one million dollars of bonds, bearing interest at six per cent. in gold, and provided for the levying of a tax to pay the interest and to provide a sinking fund. Five hundred thousand dollars of these bonds were required to be used in exchange for valid bonds previously issued and the unpaid interest thereon.

So far, upon the principle already referred to, the act and the issue of the bonds for such purpose was authorized by the Constitution ; for whatever the language used, whether to be " exchanged" for the indebtedness secured by former bonds, or to " secure" such indebtedness, the effect and the result is the same.

The act of 1873 further directed the remaining half million of bonds to be sold for United States currency at a price not less than eighty cents on the dollar, and out of the proceeds the Treasurer was required to pay an amount necessary to redeem the bonds of 1868 and 1869 from hypothecation, and next to pay the indebtedness of the State to accrue after the first day of July then next ensuing.

We have said that the power of the Legislature to issue bonds was circumscribed and limited to the issuing of bonds for securing existing public indebtedness, the erection of State buildings, the support of State institutions and perfecting public works. The Constitution has specified these as the objects for which bonds may be authorized. The purpose and intent of the Constitution must have been to limit the exercise of the legislative power upon this subject, for we must impute to it some purpose and some object to be accomplished by it. If that was not the object, we must disregard it entirely, for it would be utterly meaningless. We think it was intended to prevent the profligate increase of the public burthens by putting afloat promises to pay more than we received ; to prevent the depreciation of our credit by hawking it about at a large discount for the sake of a temporary relief, almost sure to result in future disaster.

And though such disaster has not and doubtless will not overtake the State of Florida on account of any action yet had, the fate of some of the States does serve as an example of the point sought to be guarded by our Constitution upon this subject.

The bill of complaint in this cause alleges that the State was indebted to L. P. Bayne & Co. of New York in the sum of $160,000, and that that firm held a large amount of bonds issued in 1868 and 1869 as security for that indebtedness, and this was doubtless the hypothecation referred to in the act of 1873.

The provision of the Constitution authorizing the issue of bonds to "secure" indebtedness may well, without a too broad or too narrow construction, warrant the sale of bonds for money with which to liquidate an existing indebtedness; for such a transaction is but the "securing" of the same indebtedness transferred from one creditor to another.

We will not here determine whether the sale of the $200,-000 in bonds in exchange for or to "secure" $160,000 of actual debt may be authorized under the Constitution. The Legislature has authorized the officers of the State to do that, so far as they could confer such authority, and as there are no parties before us as holders of the bonds, whose interests may be affected, it would be scarcely just toward them or toward the State to determine it in this proceeding, where they have not been heard. But we have no hestitation in holding that the issue and sale of bonds for the purpose of raising funds with which to pay the current and future ordinary expenses of the State is not warranted by the Constitution, and that so much of the act as purports to give such authority is void.

The act of 1873 further provides that no tax shall be levied for the purpose of paying the interest or the sinking fund until one-fourth of the whole amount of the bonds shall be sold.

The bill alleges that one fourth of the bonds have not been

Cheney and Wife v. Jones.

" sold ;" that the Comptroller pretends that he has sold $250,-000 of them to Bayne & Co. at eighty cents on the dollar, whereas in fact Bayne & Co. have taken said bonds at eighty cents on the dollar, in pursuance of an agreement, in satisfaction of his claim, and therefore a tax to pay the interest and sinking fund is not authorized by the act ; and that a tax has been levied for the payment of the interest and sinking fund of the whole of the one million dollars named in the act, while a great portion of them remain in the hands of the Comptroller undisposed of.

The bill does not disclose what amount if any of the bonds have been sold for cash, or what amount has been delivered in exchange and for the redemption of former valid bonds, of the State. As to the words of the act that " no tax shall be levied until one-fourth of the bonds shall be sold," while technically it may be insisted that the word " sold " means exchanged for lawful currency, the word is often used in regard to ordinary transactions among men to include " an exchange for a consideration, whether in money or other valuable thing." This is not necessarily a *barter* and not a *sale.* One may *sell* his horse for an agreed amount and receive in payment a note of the buyer or of a third person. If no part of these bonds had been sold for money, but the half million of past due bonds had been delivered to the Comptroller in exchange for the new bonds, was not this, in the contemplation of the Legislature, a *sale* of the new bonds ? Did the Legislature intend that in taking up the old interest bearing bonds and giving in exchange the new, that the holder should have no interest or principal upon the new bonds unless a certain other portion should be sold for money ? Did they intend thus to practice " Chinese " sagacity, and play the game of a trickster upon the confidence of its creditors ?

We think the Legislature intended to do what the Constitution authorizes: to " secure" the principal and interest of the debts of the State, by providing for their payment.

If, therefore, the amount of one-fourth of the bonds have been sold for cash or by taking up its money obligations, the law intends that good faith shall be kept with creditors, and that they shall be paid according to the promise, and it was the duty of the proper officers to collect the necessary amount of tax for that purpose. The objection, however, that a tax was levied to raise the amount of interest and sinking fund upon the whole one million of bonds, including a large amount unsold and yet in the hands of the Comptroller, stands upon a different footing. The Constitution authorizes the raising of taxes for paying the interest and principal of the *debt* of the State. This indebtedness was not created by the printing and signing of the bonds and depositing them in the Comptroller's vault. The amount of tax to be collected for this purpose is the amount accruing upon the bonds legitimately held bp the *bona fide* creditors of the State at the time of the levying of the tax, for there is no interest accruing upon bonds not so held.

The bill prays for a decree that the tax levied upon the property of the complainants is not lawful, and that the collection thereof be enjoined.

The bill does not show, however, what proportion of the tax was illegal and what portion was legal. It does not show that the entire amount of the tax, levied to pay interest upon these bonds, was improperly levied. It does not show what amount had been disposed of by the State in payment of or to secure its just debts. It admits that the State owed debts, and that the purpose of the issuing of at least a part of the bonds was to pay and secure them. The bill confines itself, as to that subject, to the sale of one-fourth of the bonds to Bayne & Co., and says nothing of the bonds issued to other parties. If a part of the tax was legally imposed, the collection of such part should not be enjoined.

The Supreme Court of Michigan, in Conway vs. Waverly, 15 Mich. R. p. 263, says: "The bill must be certain enough to furnish the means of giving the precise relief needed.

No court can give assistance to a party who does not show what he is entitled to demand. The bill asks relief against what must be presumed to be legal as well as illegal taxes, and the court has no means of ascertaining one from the other, while complainants could have given the means but have neglected to do so."

In Taylor vs. Thompson, 42 Ill., p. 17, the court say: "When a bill in chancery is filed to enjoin the collection of taxes on the ground that they are in part illegal, the bill must show to what extent they are so, in order that the court may enjoin only the illegal portion, or that they are so levied that it is impossible to discriminate between the legal and illegal portions."

"No objection which did not go to the very groundwork of the tax, so as to affect materially its principle and show it must necessarily be illegal,, ought to have the effect of rendering the whole invalid." Mills vs. Gleason, 11 Wis., 470.

"If the court can, under this bill, ascertain the proportion that the illegal bears to the legal bonds, it could thereby be determined what portion of this tax would be illegal, and when ascertained, the portion of the tax necessary and which would go to pay those illegally issued bonds, should be restrained, and the remainder collected." Briscoe vs. Allison, 43 Ill. R., 291.

The Circuit Court refused to grant an injunction restraining the collection of the entire tax levied for interest and sinking fund of the several bonds issued under the acts of 1871 and 1873. We think the court was correct in thus refusing to grant it. The prayer of the bill was too broad in this respect. The collection should be restrained only as to so much or such proportion of the tax as may be shown to have been improperly levied.

For the purpose of determining this, it will be necessary to amend the bill of complaint so that it may appear definitely what portion of the tax should not be collected. Other-

wise it can only be ascertained on the final hearing, upon the proofs.

The court dismissed the bill on the hearing of the motion for an injunction, and in this the court erred, for in the absence of any pleadings on the part of the defendant, there are sufficient facts alleged to show that the complainants were entitled to ultimate relief of some sort, but of which the court should be more definitely informed, so that the precise relief to which they were entitled may be seen by the court.

The order of the Circuit Court dismissing the bill must therefore be reversed.

It was suggested that the Comptroller should be made a party, so that he may answer and file such exhibits as will bring the whole facts before the court. We do not think it necessary that he shall be made a party for that purpose. All the facts within his knowledge and under his control are accessible by the ordinary methods, and he certainly does not desire to be compelled to disclose them.

The decree of the Circuit Court, so far as it dismissed the complainants' bill, is reversed.