

Ernest Amos, as Comptroller of the State of Florida, and W. V. Knott, as Treasurer of the State of Florida, *Appellants*, v. John E. Mathews, *Appellee.*

The State of Florida, on the Relation of Fred H. Davis, Attorney General of said State, *Petitioner*, v. Doyle E. Carlton, as Governor, et al., etc., *Respondents.*

En Banc.

Opinion Filed January 23, 1930.

2

6

*O. K. Reaves,* of Tampa; *Giles J. Patterson, E. J. L'Engle,* of Jacksonville; *Fred H. Davis,* Attorney General, and *Marvin C. McIntosh,* Special Assistant, of Tallahassee, for Appellants in equity cause and the Respondents in quo warranto;

*John E. Mathews,* of Jacksonville; *D. Stuart Gillis,* of DeFuniak Springs; *Y. L. Watson* and *Hugh Taylor* of Quincy, for Appellee in the equity cause and for the Petitioner in the quo warranto.

STRUM, J.—These causes bring before us for consideration the validity of two statutes passed at the extraordinary legislative session of 1929, namely, Chapter 14486, known as Senate Bill One, and Chapter 14575, known as Senate Bill Five, both approved by the Governor on June 21, 1929.

These two Acts are cognate parts of a single purpose—the liquidation and retirement of designated road and bridge bonds—in the accomplishment of which purpose the provisions of the two Acts are inextricably interrelated. They should therefore be construed *in pari materia* as one enactment. Curry v. Lehman, 55 Fla. 847, 47 So. R. 18; State v. McMillan, 55 Fla. 246, 45 So. R. 883.

Chapter 14575 (Senate Bill Five) levies two primary excise taxes, the first "a license tax of five dollars to the State" to be paid by every dealer in gasoline; and the second, "in addition thereto a tax, herein termed gas tax, of five cents per gallon for every gallon of gasoline * * * sold, * * * said tax of five cents per gallon being made up of four 'separate' taxes * * * " as follows:

First gas tax: Two cents per gallon for use of the State Road Department. Neither this tax, nor the five dollar license tax upon dealers which is required to be paid "to the State," is under attack in this litigation.

Second gas tax: One cent per gallon to be apportioned to the several counties "in the proportion collected in such counties respectively."

Third gas tax: One cent per gallon to be apportioned to the several counties in proportion that the bonded indebt-

edness of such county for roads and bridges, including special tax road and bridge districts, bears to the bonded indebtedness of like character of all the counties of the State. In other words, this apportionment is according to the proportion of bonded road and bridge indebtedness of the several counties, in computing which the bonded indebtedness of special tax road and bridge districts in such counties is included. Expenditure of the proceeds of the second and third gas taxes is restricted by the statutes (with an exception not material here) to the payment of existing bonded indebtedness of counties and special tax road and bridge districts incurred for the building of public roads and bridges and for which bonds were issued and outstanding on April 1, 1929. It is unnecessary to consider in this controversy whether or not such funds may be applied upon bonds authorized for the purpose of refunding the bonds just above mentioned.

The proceeds of the second and third gas taxes never reach the hands of local county or district officers. Such funds are collected under the supervision of the Comptroller and are disbursed by the State Treasurer directly to the paying agencies for the bonds, or to the holders thereof. In making such disbursements, however, the State Treasurer acts as ''County Treasurer ex officio.''

Fourth gas tax: One cent per gallon to be apportioned équally amongst the several counties, two-thirds of which shall be ''used for school purposes'' and one-third for the construction of roads and bridges ''in the county to which it is apportioned.'' When collected by State officials, the fourth gas tax is paid over to local county officials to be disbursed by the latter as directed by the statute.

Amongst other things, Chapter 14486 (Senate Bill One) provides that: (a) ''It is hereby declared by the Legislature of the State of Florida that all roads, highways and

bridges which have heretofore been constructed or built, in whole or in part, from the proceeds of bonds issued by the counties of the State of Florida, or from the proceeds of bonds issued by Special Road and Bridge Districts under the laws authorizing same, have been and are, and will continue to be beneficial to the State of Florida at large, and have contributed substantially to the general welfare, settlement and development of the entire State.'' (b) It requires local bond trustees theretofore charged with the administration of sinking funds of county and district bonds issued for the construction of roads and bridges to turn over to the State Treasurer, as County Treasurer ex officio, all funds and securities under the control of said Trustees, together with their records relating thereto, to be held by the State Treasurer, as County Treasurer ex officio, for the benefit of the respective counties and districts, such funds to be kept in separate accounts. (c) That all bonds of the character under consideration shall remain the obligations of the counties and districts issuing them. (d) It authorizes the issuance of refunding bonds under certain circumstances, subject to the approval of the Board of Administration hereafter mentioned. (e) ''For the purpose of administering the provisions of the Act, and such money as is available by law,'' the Act creates a Board of Administration consisting of the Governor, State Comptroller and State Treasurer. (f) The Treasurer is required to keep a separate account for each county and road district of all monies received from the local trustees as sinking funds, which accounts are sometimes termed sinking fund accounts; and also to keep separate accounts for each county of all monies received for and applicable to the credit of such county from any tax upon gasoline applicable to the bonds of such county, which includes gas taxes two and three levied by

Chapter 14575 (Senate Bill Five), or received from any personal property tax on motor vehicles similarly applicable. (g) The Board of Administration is required annually on or before June 1st to estimate the amount of money available to the several counties and districts for the next fiscal year from each of the sources just mentioned, and to give notice to the several Boards of County Commissioners, and to district officials, of the amounts available to them respectively. In arriving at the amount so available to the several participating subdivisions, the Board shall first apply moneys in the several sinking fund accounts. If those funds are not sufficient to meet current requirements in any county the Board shall next apply any moneys available, or estimated to become available, to the credit of that county from gas taxes and personal property taxes on motor vehicles. In apportioning the amounts so available to the several counties and districts from sources other than the sinking fund accounts, the Board is required to apportion to each county or district such proportion of the available funds as the amount of the participating bonds of that particular subdivision bears to the aggregate amount of all participating bonds to which the proceeds of the taxes are applicable, that is, in proportion to the participating bonded indebtedness. It may be here remarked parenthetically that the last mentioned apportionment would apparently include funds arising from the second gas tax, and would therefore be in conflict with the apportionment of that particular tax provided for in Senate Bill Five, which is ''in proportion collected in the several counties.'' If the amount available from the sources mentioned is sufficient to meet all maturing principal and interest and sinking fund requirements during any fiscal year, no *ad valorem* tax shall be levied by the local officers for that purpose in that year. If the amount

so available is not sufficient for the purposes stated, then the local county or district officials shall levy a sufficient *ad valorem* tax in the respective counties or districts to make up the deficit. The proceeds of any such *ad valorem* tax so levied shall be remitted monthly by the local county officials to the State Treasurer, as County Treasurer, ex officio, to be disbursed by him for the benefit of such county or district. See Secs. 14 and 16. (h) The Act expressly declares that its provisions are intended for the benefit of taxpayers and property owners of the State, and for the purpose of rendering assistance to the several agencies which have already performed a part of the functions resting on the State in the construction of roads, and that it is not the purpose or intention of the Act to obligate the State, directly, indirectly or contingently, for the payment of any of the bonds referred to.

Neither Chapter 14573, Acts of 1929, levying an additional or sixth cent tax per gallon upon gasoline for educational purposes, nor Chapter 14574, Acts of 1929, requiring the collection of an *ad valorem* tax on automobiles, the proceeds of which are to be administered by said Board of Administration and applied to the payment of bonds of the character hereinabove referred to, are involved in this litigation.

Two suits have been filed in which the constitutionality of Senate Bills One and Five are questioned. One is a taxpayers suit brought in the Circuit Court of Leon County by the appellee John E. Mathews seeking an injunction against the Comptroller and Treasurer to prevent them from collecting the taxes levied by Senate Bill Five and to prevent them from disbursing any moneys, or otherwise performing the functions prescribed for them by Senate Bill One. The other suit is in the nature of a quo warranto, the information having been filed in this Court in

the name of the State on the relation of the Attorney General, against the Governor, the State Comptroller and against the State Treasurer, as such, and as ex-officio County Treasurer, questioning the authority of said respondents to exercise the offices, franchises and powers created by Senate Bill One.

The injunction suit is now before us on defendant's appeal from the decree of the chancellor enjoining in certain respects the distribution of certain of the taxes to be collected pursuant to Senate Bill Five, but holding the levy of each of such taxes valid. The complainant below in that suit, appellee here, has filed cross assignments of error challenging the correctness of the chancellor's ruling that the levy and collection of such taxes are valid. The quo warranto is before us upon a demurrer to the information. Substantially the same constitutional questions are raised in both suits. The two causes will therefore be considered together.

It is asserted against the statutes under consideration: (a) That they are void for vagueness, indefiniteness, ambiguity, and uncertainty. (b) That they violate Sec. 16 of Art. 3 of the Constitution in that they are misleading, the subject is not briefly expressed in the title, and that the Acts embrace more than one subject and matters properly connected therewith. (See Richmond v. Pace, 103 So. E. R. 647.) (c) That the alternative methods of apportionment provided in Senate Bill Five constitute an unlawful delegation of legislative power. (d) That the statutes violate Sec. 11 of Art. 16 of the Constitution relating to claims against the State. (e) That by the inclusion of the Governor, State Comptroller, and State Treasurer as members of the Board of Administration, these officers are required "to perform the functions of more than one office under the government of the State at the same time," contrary

to Sec. 15 of Art. 16 of the Constitution. (f) That Senate Bill One violates Sec. 1 of Art. 3 of the Constitution in that it delegates legislative power to the Board of Administration, and that it violates Sec. 27 of Art. 3 in that it creates new offices and provides for filling them in a manner contrary to the Constitution.

The immediately foregoing propositions designated as (a) to (f), inclusive, have been considered by Mr. Chief Justice Terrell in a separate opinion prepared by him and filed herein. The views expressed by Mr. Chief Justice Terrell upon the six propositions just stated are agreed to.

The validity of the statutes as against other asserted constitutional objections will now be considered. The two statutes, taken together, provide for: (1) the levy of certain excise taxes; (2) an apportionment thereof amongst the several counties; (3) the application of the proceeds of the taxes to designated purposes; and (4) a plan of administration of such funds through a Board of Administration composed of State officers.

It should be constantly borne in mind that the taxes here involved are excise, not *ad valorem*, taxes.

First, as to the validity of the levy:

It will be helpful to an understanding of what is to follow to reiterate at the outset a few principles of constitutional construction universally sanctioned: (1) It is the function of the courts to interpret the law, not to legislate. (2) Courts are not concerned with the mere wisdom or policy of legislation so long as such legislation squares with the Constitution. (3) The Courts have no power to strike down an Act of the Legislature unless the provisions of the Act, or some of them, clearly violate some express or necessarily implied inhibition of the Constitution. (4) Every reasonable doubt must be indulged in favor of the Act. If it can be rationally interpreted to harmonize with

the Constitution it is the duty of the courts to adopt that construction and sustain the Act. (5) To the extent, however, that such an Act violates express or clearly implied mandates of the Constitution, the Act must fall—not merely because the court so decrees, but because of the dominant force of the Constitution, an authority superior to both the legislature and judiciary. Such an Act never becomes a law. See Jackson Lbr. Co. v. Walton County, 116 So. R. 771; Lainhart v. Catts, 73 Fla. 735, 75 So. R. 47; State v. Bryan, 50 Fla. 293, 39 So. R. 939.

In approaching the question of the power of the legislature to levy taxes, it should further be borne in mind that our State Constitution is not a grant of power to the legislature, but is a limitation voluntarily imposed by the people themselves upon their inherent law making power, exercised under our Constitution through the legislature, which power would otherwise be absolute save as it transcended the powers granted by the State to the Federal Government. State v. Stone, 71 Fla. 517, 71 So. R. 634; Cheney v. Jones, 14 Fla. 587. The State therefore possesses, as an attribute of sovereignty, the inherent power to impose all taxes not expressly or by clear implication inhibited by State or Federal Constitutions. Amos v. Gunn, 84 Fla. 285, 94 So. R. 615; Cooley, Taxation (4th ed.) p. 149. Where the Constitution expressly prescribes the manner of doing a thing, it impliedly forbids its being done in a substantially different manner, even though the Constitution does not in express terms prohibit the doing of the thing in such other manner. Weinberger v. Board of Public Instruction, 112 So. R. 256.

"The true spirit of constitutional interpretation * * * is to give full liberal construction to the language, aiming ever to show fidelity to its spirit and purpose. * * * Constitutional provisions, whether operating by way of

grant or limitation, are to be enforced according to their 'letter and spirit,' and can not be evaded by any legislation which, though not in terms trespassing upon the letter, yet in substance and effect destroy the grant or limitation." Fairbank v. U. S., 181 U. S. 283, 45 L. Ed. 862.

This court has held that "the courts should not declare a statute to be void or inoperative on the ground that it is opposed to a spirit that is 'supposed' to pervade the Constitution." State v. Johns, 109 So. R. 228; Cooley's Const. Lim. (7th ed.) p. 239. But it does not necessarily follow that in every case the courts must be able to point out some express inhibition which has been disregarded, or some express command which has been disobeyed, before the courts can set aside a statute as invalid. "The intent of organic or statutory provisions is the essence of the law and such intent may be shown by the 'implications and intendments' as well as by words of express provisions; and implied provisions of organic or statutory law are as effective as the express provisions, when such implied provisions are judicially declared to exist." Getzen v. Sumter County, 85 Fla. 45, 103 So. R. 104. And in re: Advisory Opinion, 94 Fla. 967, 114 So. R. 850, this Court said that "the spirit as well as the letter" of constitutional inhibitions "should be preserved and given full force and effect." Constitutional restraints, therefore, may be found either in the express language employed or in the purpose clearly, though impliedly, evidenced thereby. The object of constitutional construction is to ascertain and effectuate the intention and purpose of the people in adopting it. That intention and purpose is the "spirit" of the Constitution—as obligatory as its written word. That spirit, however, can not consist of mere sophistry nor of fanciful or conjectural theory. It must be found in those implications and intendments which clearly flow from the express

mandates of the Constitution when considered in the light of circumstances and historical events leading up to its adoption, from all of which the purpose of the people in adopting it is to be gleaned. State v. Butler, 70 Fla. 102, 69 So. R. 771; Mugge v. Warnell, 58 Fla. 318, 50 So. R. 645; Brown v. Lakeland, 61 Fla. 508, 54 So. R. 716; State v. Greer, 88 Fla. 249, 102 So. R. 739, 37 A. L. R. 98; Getzen v. Sumter County, 89 Fla. 45, 103 So. R. 104; Rathbone v. Wirth, 45 N. E. R. 15, 34 L. R. A. 408; Holland v. State, 15 Fla. 455, 523; People v. Hurlburt, 24 Mich. 44, 9 Am. R. 103; Cooley Const. Lim. (7th ed.) p. 98, 242.

The purpose of the people in adopting the Constitution should be deduced from the Constitution as an entirety. Therefore, in construing and applying provisions of the Constitution, such provisions should be considered, not separately, but in co-ordination with all other provisions. Mugge v. Warnell, 58 Fla. 318, 50 So. R. 645; Ex parte Pricha, 70 Fla. 265, 70 So. R. 406; Brown v. Lakeland, 61 Fla. 508, 54 So. R. 716.

In view of the principle that when a tax is levied solely for a purpose prohibited by the Constitution the levy is illegal, it will be well to now classify the second and third gas taxes to ascertain whether they are levied as State taxes or as county taxes, since different rules will apply, depending on whether they are the one or the other. The fourth gas tax will be considered separately.

It is contended both for and against the Acts that the second and third gas taxes are levied as State taxes. In defense of the Acts it is contended that the construction of roads and bridges is a State function and purpose; that the State could have constructed the roads referred to in the Acts and could have levied a State excise tax to pay for them; therefore, the counties and districts having performed a function resting upon the State in the building

of roads, and the State having recognized such roads as beneficial to the State, it follows that the State may now levy a State excise tax and apply it in payment of county and district bonds, the proceeds of which were used to construct the roads, so long as the State assumes no *obligation* to pay the bonds, which, it is asserted, is avoided by the express provision in the Act that the State assumes no obligation but that the proceeds of the tax shall be applied to the payment of such bonds as a gratuity, and further by the express declaration in Senate Bill One that such appropriation of the proceeds of the tax is for the specific benefit of taxpayers and property owners of the State, and not of the bonds. From this argument the conclusion is reached that the levy of said second and third gas taxes, as State taxes, is valid.

Those assailing the Act contend that the purpose of the tax is not to construct roads, for the roads in question have already been constructed and completed, but its purpose is to pay off county and district debts; that the payment of such obligations violates the clear intendment of Sec. 6 of Art. 9 of the Constitution; and that the tax being a State tax, and the payment of local county and district debts not being an "expense of the State" within the meaning of the Constitution, Sec. 2 of Art. 9, to which the State is confined in levying State taxes, the levy is void.

It is our duty to resolve any doubt as to the character of the tax in favor of such a construction as will harmonize the levy with the Constitution, or to avoid grave doubts on that score, if it can be rationally done. Hiers v. Mitchell, 116 So. R. 81..

Sec. 2 of Art. 9 of the Constitution is as follows:

"The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each

fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State.''

In Cheney v. Jones, 14 Fla. 587, it is stated in the fifth headnote: '' * * * the legislative power over the subject of taxation is also limited, because the several purposes for which taxes may be levied are in like manner prescribed; the several purposes for which the Legislature may cause taxes to be levied being expressly named in the Constitution, and these purposes being sufficient for defraying the expenses of conducting the affairs of the government of the State.'' Discussing this proposition in the body of the opinion, and with reference to the purpose and effect of Sec. 2 of Art. 12 of the Constitution of 1868 (now Sec. 2, Art. 9, Constitution of 1885), the Court said: ''Measuring the power of the Legislature by the terms of the Constitution in respect to the levying of taxes, we find that it is permitted 'raise revenue sufficient to defray the expenses of the State' (which includes such expenditures as may be authorized by the Legislature and which are not prohibited by the Constitution), and 'to pay the principal and interest of the existing indebtedness of the State.' This provision is so broad that we can not perceive it to be necessary to the due exercise of all the powers of government to travel outside of it for any legitimate object. It erects a boundary also, which we think was intended to protect the people from errors which sometimes have been committed by Legislatures. It prescribes what may be done, how far the Legislature may go in levying taxes; and upon the principles alluded to, it is a limitation not wanting in directness to amount to a prohibition.''

Except as otherwise contemplated by the Constitution, that construction would necessarily preclude the direct levy

by the Legislature of a tax for an *exclusively* county pur-
pose, the State being confined, so far as Sec. 2 of Art. 9
is concerned, to the levy of taxes for State purposes or for
purposes in which the State has a sovereign interest.

The Constitution of 1885 is a revision of the Constitution
of 1868. Sec. 2 of Art. 12 of the Constitution of 1868 was
retained *verbatim* as Sec. 2 of Art. 9 of the Constitution
of 1885. In re-adopting that Section *verbatim* in the Con-
stitution of 1885, the people did so with knowledge of the
construction placed on it in Cheney v. Jones. It is there-
fore presumed that the people were content with that con-
struction and adopted it along with the re-adoption of the
Section, otherwise the language of the Section would have
been altered· in the Constitution of 1885.

Sec. 6 of Art. 9 of the Constitution provides:

"The Legislature shall have power to provide for
issuing State bonds only for the purpose of repelling
invasion or suppressing insurrection, or for the pur-
pose of redeeming or refunding bonds already issued,
at a lower rate of interest."

In re: Advisory Opinion, 114 So. R. 850, this Court said
with reference to the anti-bonding provision just quoted:
"The spirit as well as the letter of this Section should be
preserved and given full force and effect. Its purpose
should not be defeated or frittered away by any narrow
or technical construction." See also Hathaway v. Monroe,
119 So. R. 149; State v. Green, 116 So. R. 66.

If the second and third gas taxes are *State* taxes, the
levy thereof is clearly repugnant to Sections 2 and 6 of
Art. 9 of the Constitution, and must therefore fall. The
following reasons lead us to the conclusion just stated:

Generally speaking, public roads and bridges may be

constructed either as a State purpose or a county purpose. They usually benefit both the State at large and the county. in which they are located. This Court has recognized this dual purpose in road building. Lewis v. Leon County, 107 So. R. 146; Jackson Lbr. Co. v. Walton County, 116 So. R. 771. Undoubtedly, the State could have taken upon itself the original construction of the public roads here under consideration and could have levied State taxes to pay for them as construction progressed. But the State did not do so. Undoubtedly, also, the counties and districts had legislative authority to construct them, as for county and district purposes, and they voluntarily chose to so construct them because they deemed them essential to local progress and prosperity. The counties and districts could have refrained, but they did not; they borrowed the money by issuing bonds and constructed the roads. The Legislature merely authorized, it did not compel. So each of the counties and districts, of its own choice, took the necessary steps to issue the bonds upon the ground that the construction of the roads in question constituted a county (or district) purpose, which it was, although the same construction projects might have been accomplished by the State as a State purpose. Construction of these roads, however, as local projects has been completed and that transaction is at an end. There remains only the payment of the local obligations thus incurred. The county and district bonds to pay for those roads were issued and validated as county and district bonds. Hence their legal status became fixed as purely county and district obligations, issued for a local purpose. They were not, and could not be, State obligations.

That the construction of these roads and bridges resulted in benefit to the State may be conceded. That fact alone, however, does not preclude their construction as a local

or county purpose, nor render the expense thereof an improper subject of local taxation. In a sense, any public improvement which benefits a county or a city also benefits the State to some extent. But if the State can justify itself in assuming to pay these bonds by State taxation merely because it acknowledges that the constructionu of the roads were a benefit to the State, then by the same process of reasoning the State counld justify itself in paying off, by State taxation, every bond issue incurred by any municipality in the building of public streets, thus centralizing the power of taxation to pay the cost of *local* improvements in a manner not contemplated by our Constitution. The tendency in this direction is already indicated by the introduction at the same session of the Legislature at Which Senate Bills One and Five were passed, of several Acts undertaking to create "road and bridge districts" of certain towns so as to qualify the bonds of such towns, issued for street paving purposes, to participate in the proceeds of the gas taxes now under consideration.

It is clear that a State purpose, or State expense, can not rest upon any such broad and general conception of State benefits as that just referred to. Local taxes must be levied to pay for local improvements already constructed, even though there is an element of incidental general benefit in them.

In Martin v. Dade Muck Land Co., 116 So. R. 449, this Court said: "In view of the limitations contained in Sec. 6 of Art. 9 of the State Constitution * * *, the State can not legally (with State funds) in any form or manner, either directly, indirectly, or contingently 'pay' or be obligated to pay the whole or any part of the principal or interest of the bonds authorized to be issued by the Everglades Drainage District." It was plainly stated that the State not only could not "obligate" itself to pay such

bonds, but that it could not "pay" them, either directly, indirectly or contingently. The same rule, and for the same reason, applies to bonds issued by counties and dis-·tricts for road building when the project was undertaken and completed as a local purpose, and the bonds issued and validated as local obligations.

It would be more than mild inconsistency to hold that while the State was without authority to issue those bonds in the first instance, it could nevertheless authorize its subordinate subdivisions to issue them and the State subsequently levy a State tax to pay the obligations which the State in the first place could not issue or assume. That such payment would be made as a "gratuity," and not as an obligation, does not aid the situation, when by the intendments of Sec. 6 of Art. 9 the State is inhibited from "paying" bonds of this character. The conclusion is inescapable that such a plan would constitute an indirect method of accomplishing that which the State can not do directly, and would afford a convenient means and a precedent for nullifying the provisions of Sec. 6 of Art. 9 of the Constitution. It has more than once been held by this Court, and we now re-affirm, that the Constitution contemplates that the expenses of the State, including its activities in building *or paying. for* roads, shall be kept within its "revenue for each fiscal year," that is upon virtually a cash basis, and that such expense can not, by any plan of circumlocution, be anticipated by the issuance of bonds, except in the cases expressly recognized in the Constitution. In re: Advisory Opinion, 114 So. R. 850; State v. Green, 116 So. R. 66; in connection with which should be read Hathaway v. Monroe, 119 So. R. 149. As recently as the year 1920 a proposed constitutional amendment authorizing the State to bond itself for the construction of roads was defeated at the polls. Acts 1919, p. 341.

By Sec. 5 of Art. 9 of the Constitution, the several counties may be authorized to assess and impose taxes for county purposes, and for no other purposes. Therefore, bonds issued by the county must be issued for county purposes, and for county purposes only, otherwise no tax could lawfully be levied to pay them. It follows that when these bonds were issued, they were issued and validated as for County (or district) purposes *only*. By what logic then, in view of the inhibition of Secs. 2 and 6 of Art. 9 of the Constitution, may a *State tax* be levied to pay them?. Senate Bill One expressly declares that these bonds to the payment of which these taxes are to be applied ''shall remain obligations of said counties or special road and bridge districts, respectively, and each of said counties or districts shall be legally liable for the full amount of *its* bonds so issued by it and outstanding.'' From what has been said, it must be clear that while the original construction of roads and bridges may constitute a dual purpose, and one which can be accomplished by either State or appropriate local taxation, it does not follow that after such roads have been constructed and completed as local projects and bonds have been issued as local bonds to pay the cost thereof, that the payment of such bonds can similarly constitute a dual purpose justifying the imposition of State taxes to pay such local obligations, for the reason that Secs. 2 and 6 of Art. 9 of the Constitution intervene to prohibit the payment of such obligations with *State* funds. To hold otherwise would clearly transcend the spirit and purposes of Sec. 6 of Art. 9. Since the payment of such bonds can not lawfully constitute ''expenses of the State,'' to the raising of revenue for which purpose the Legislature is limited in the imposition of *State taxes* by Sec. 2 of Art. 9, the levy of these taxes, if State taxes, would be repugnant also to the latter provision of the Constitution.

In support of these taxes, as State taxes, City of Lowell v. Oliver, 8 Allen (Mass.) 247 is cited. In that case the court sustained the levy of a State tax to reimburse cities for bounties previously paid to State soldiers. The Court says: "If the object of the appropriation is a legitimate one, * * * we can see no valid distinction in principle between a right to raise money for a specific object yet to be accomplished and a right to raise it to defray the expenses of the same object after it has been attained." The important postulate of that assertion is "If the appropriation is a legitimate one." As explained in the subsequent case of Agawam v. Hampdon, 130 Mass. 528, 534, the raising and support of soldiers is a State function *and remains* such, notwithstanding that a municipality has advanced the expense. So the State may later levy a State tax to reimburse such municipalities. We can not apply that principle to the levy in this State of a State tax to pay the bonded obligations of counties and districts incurred for the building of roads as local projects, because Sec. 6 of Art. 9 of the Constitution prohibits the payment by the State of such obligations, consequently Sec. 2 of Art. 9 also intervenes to prevent the levy of State taxes to pay those local obligations, since they are not "expenses of the State" and consequently the appropriation of State taxes for such purpose would not be a "legitimate object." In the case of the soldiers' bounties, although a municipality first advanced the money, the purpose is not thereby transmuted into a form of obligation which the State is prohibited to issue, assume or pay as is the case under our Constitution the purpose here being not to construct roads, but to pay off an existing county (or district) bonded debt. Here the counties and districts, by their voluntary acts, have fixed the character of these obligations, and placed

them in a field of taxation that the State can not enter by the levy of State taxes.

In Thomas v. Leland, 24 Wend. (N. Y.) 65, strongly relied upon by appellants to sustain these taxes as State taxes, ''the general purpose of raising the money by tax was * * * to 'contract' a canal, a public highway, which the Legislature believed would be to the benefit of the City of Utica, as such, and independently of the bond the case is the ordinary one of local taxation to 'make and improve' a highway.'' No constitutional provision inhibited the payment of the debt there in question. Our Constitution inhibits the payment with State taxes of the debts here in question. See also Cooley, Taxation (4th ed.) Sec. 1817, p. 3568.

For the reasons stated, the second and third gas taxes can not be sustained as *State* taxes.

Can the second and third gas taxes be rationally and consistently regarded as county taxes? It is our judgment that they can, because the revenue to be derived therefrom is to be applied solely to a local purpose. To raise revenue for local purposes is the sole aim of the Legislature in imposing these taxes.

Whether a tax directly imposed by the Legislature, but the proceeds of which are to be applied to local purposes, is a State tax or a county tax seems to be the subject of conflicting opinions.

In Pennsylvania it is held that the character of a tax, as a State or local tax is determined by the Act which authorizes its imposition and not by the use to be made of the revenues to be derived therefrom. Elliott v. Philadelphia, 229 Pa. 215, 225.

In New Jersey it is held that all taxes directly levied by the State, whether for State, county or municipal purposes,

are State taxes. United N. J. R. R. Co. v. State Board of Assessors, 67 Atl. R. 438.

. A legislative declaration as to the character of the tax is of great weight, although not necessarily controlling. See 251 U. S. 95; 250 U. S. 459. In the absence of such an express declaration, however—and we have none in these Acts—the purpose for which the revenue is to be raised, and to which it is to be applied, affords a controlling guide to the nature of the tax in the absence of superior contravening indicia.

The principle is thus expressed by Judge Cooley in Youngblood v. Sexton, 32 Mich. 406, 20 Am. R. 654:

"In one sense, undoubtedly, any tax levied by a general law is a State tax; but if the moneys are to be put to local uses, the only substantial difference . between that and one levied by local action consists in this: that in one case the State levies the tax, and in the other it authorizes the levy. All taxation must be authorized by the State, and we know of no reason why all taxation for the ordinary purposes of government may not be levied under general laws when no express provision of the Constitution forbids it. Such legislation is no novelty in this State or elsewhere. Highway and school taxes are very commonly levied in that way; the local authorities, as to some of them, having no option, but being put under legal compulsion to assess and collect them. The school mill tax may be taken as an illustration. Collected under a general law, it was nevertheless put to the uses of the community which paid it; and it was in no proper sense anything more than a local tax. Neither is the . tax now in question."

We therefore conclude, in the absence of superior contra-

dicting circumstances in the Act, that the second and third gas taxes are levied as county taxes, since it is to be presumed that the legislature intended a valid levy.

Since these taxes are county taxes, the *purpose* of the levy is lawful.

To hold that if these taxes are State taxes their levy would be illegal, yet if they are county taxes their levy and the application of the proceeds to a purpose for which the State could not levy a State tax, is valid, involves no inconsistency of thought or principle. If the legislature has the power to levy the tax, it has the power to prescribe the use to be made of the revenue, so long as the use so prescribed is consistent with the Constitution. The Constitution forbids the use of a State tax to pay county bonds, but it sanctions the use of a county tax for that purpose. If levied as a county tax, however, the revenue becomes county funds, not a State fund. These revenues never enter the treasury of the State, though the custody thereof may be committed to the State Treasurer, as County Treasurer ex-officio, by virtue of an express constitutional provision which will be noticed later. The legislature, as we shall also see hereafter, has the power to directly levy an excise tax for county purposes. It may therefore apply the revenue to the payment of county obligations, provided it is properly apportioned amongst the counties, as the Constitution contemplates the levy of county taxes for county purposes, but not the levy of State taxes for county purposes.

It may be said that it is of no importance to the taxpayer whether the tax be a State tax or a county tax— that the levy thereof exacts from him the same toll in either event. It may be conceded that the taxpayer contributes the same sum to the public coffers in either instance. But whether it is a State tax or a county tax is a

question of prime importance in the apportionment of the tax amongst the several counties, and consequently the answer to that question exerts a vital influence upon the re-distribution of the benefits of the tax amongst the people who pay it.

With respect to the contention that if these taxes are levied as county taxes the direct and compulsory levy thereof by the State impairs the principle of "local self government," let us now consider and ascertain the intent and purpose of the people in that respect as evidenced by the adoption of the Constitution.

After dividing the government of the State into three departments, legislative, executive and judicial, the Constitution in Articles 3 and 4 thereof, creates certain offices, namely, Senators and members of the House of Representatives, a Governor and his Cabinet, to the incumbents of which offices, together with certain subordinate officers created by law, are confided the governmental affairs of the legislative and executive departments of the State. These officers, together with the Judicial Department provided by Art. 5, form the State government. The authority of these officers extends territorially throughout the State, except as to certain of the judicial officers. See Advisory Opinion, 13 Fla. 687.

Having thus constituted the State government, the Constitution in Art. 8 directs its attention to local county and municipal affairs. In Sec. 1 of Art. 8 the Constitution ordains that "the State shall be divided into political divisions to be called counties," and Sec. 2 of that Article provides that "the several counties as they now exist are hereby recognized as the legal political divisions of the State." Sec. 24 of Art. 3 requires the Legislature to establish a uniform system of county government. Sec. 3 of Art. 8 contemplates that counties, as such, may incur in-

debtedness when duly authorized. Sec. 4 prohibits the legislature from removing the county seat of any county. Sec. 5 recognizes the county commissioners as the general administrative board of the county. Sec. 6 provides for the election of county officers by the electors in each county, the obvious purpose of which was to provide generally for local officers for the administration of local county functions, whose "powers, duties and compensation shall be prescribed by law." That is, while the *existence* of these officers is recognized by the Constitution as a part of our plan of government, their *powers* are wholly statutory. See Parker v. Evening News Co., 54 Fla. 544, 45 So. R. 309; Bowden v. Ricker, 70 Fla. 154, 69 So. R. 694; Stephens v. Futch, 73 Fla. 708, 74 So. R. 805. The territorial authority of such officers is limited to the county. Sec. 15 of Art. 12 provides that all county officers, except county school officers, shall be paid from the general funds of these respective counties. Sec. 10 of Art. 18 provides for the first election of county officers. Sec. 3 of Art. 13 requires each county to provide for the poor of the county. Sec. 3 of Art 7 provides that each county shall have representatives in the legislature. Sec. 4 of Art. 16 requires that each county officer shall keep his office at the county seat, and keep his records there.

It is fundamentally true that all local *powers* must have their origin in a grant by the State which is the fountain and source of authority. Nevertheless, those provisions of the Constitution just above quoted, and other cognate provisions, clearly imply,—and it is therefore the spirit of the Constitution,—that the performance of State functions shall be confided to State officers; the performance of county functions of purely local concern shall be confided to county officers. Save as is otherwise clearly contemplated by the Constitution, there can be no compromise

with that principle, the origin of which is more ancient than the Constitution itself. In England, a similar sub-division of the realm for the performance of functions exclusively local in character existed from the earliest recorded times, the English counties possessing recognized powers in matters of purely local concern. See Taylor's Origin and History of the English Constitution, Vol I, p. 41, 42; Vol. II, p. 190. Even when our Constitution of 1885 was adopted, existing facilities for transportation and communication, coupled with the geographic location of many of our counties, were such that a journey to the State capital by the resident legislative representatives of such counties often involved a tedious and devious journey of several weeks. Such isolation from the seat of the State government rendered indispensable the continued performance of purely local functions by local officers whose delegated *powers* were prescribed by Constitution and statute. So settled and of such ancient origin was that plan for the administration of affairs of purely local concern that it did not become the subject of an express provision in the Constitution, nor was such necessary, when it so plainly appears from the implications of the express language that a continuation and preservation of the principle as an incident to our form of government was so clearly assumed. Sec 24 of our Declaration of Rights provides: "This ennunciation of rights shall not be construed to impair or deny others retained by the people." That certain rights are retained by the people is therefore clearly implied.

This declaration and others, says Mr. Justice BROWN, speaking for this Court in State v. City of Stuart, 120 So. R. 337, "even limit to some extent the exercise of the tremendous, but inherent and well established, powers of taxation and eminent domain."

Under Sections 5 and 6 of Article 8, the legislature possesses plenary power over the "powers, duties and compensation" of county officers. Thus it was held in State v. Fearnside, 87 Fla. 349, 100 So. R. 256, that "there is nothing in our Constitution that prohibits the legislature from enacting a statute taking away from the boards of county commissioners, not only a part, but the whole of their powers of supervision and control of public roads and bridges, and lodging such powers elsewhere, since the control of all general public highways is vested in the State absolutely without any constitutional limitation or restriction." See also Jackson Lbr. Co. v. Walton County, 116 So. R. 771, 777; State v. Johnson, 71 Fla. 363, 72 So. R. 477; State v. Walton County, 112 So. R. 630; Martin v. Dade Muck Land Co., 116 So. R. 449, 464. And it is appropriate here to refer to the fact that county tax collectors and other local officers are utilized by the State in the local collection of State taxes, which in a sense might be said to be the performance by these officers of a purely ministerial and non-discretionary State function, but that custom has received the sanction of long usage, and the performance by the local officers of these duties in no wise interferes with the discretion vested in these officers in the performance of their local duties. Conversely, it has long been the practice for State officers to collect automobile and express company license taxes and to remit to the several counties a portion thereof as county taxes as provided by statute. These functions performed by the State officers are additional duties and do not interfere with their constitutional duties as State officers. But the *existence* of local county officers as a part of our form of government, and for the performance of purely local functions, is clearly recognized by the Constitution, although the legislature possesses powers of the broadest possible

nature consistent with the constitutional existence of those officers, in determining the extent of their local *powers* and duties. Therefore, while the legislature may shape local institutions and regulate the frame work of local government with reference to local *powers,* it can not abrogate these constitutionally recognized institutions and take to itself the complete and direct exercise of local functions in matters of *purely local concern.*

It is contended in this case that a county is a mere arm or agency of the State—that it is merely "the State acting locally." The foregoing resume of our constitutional system negatives this theory so far as the administration of purely local affairs is concerned. It is true that a county is an agency of the State, having no inherent power, but deriving its powers wholly from the sovereign State. It is also true, to paraphrase the language of one of the briefs herein, that the principle of local self-government does not constitute each county "an independent sovereignty, managed by a board having legal rights." Nevertheless, their existence as local entities for local purposes as well as their existence as legal political divisions of the State is recognized by the Constitution. The same power which created the legislature, namely, the sovereign people, recognized the counties. While a county in the performance of certain functions is an agency or arm of the State, it is also something more than that. If a county were no more than a mere agent of the State,—the State acting locally,—bonds issued by a county would in effect constitute State bonds, and therefore by virtue of Sec. 6 of Art. 9 of the Constitution would be void *ab initio.* While the county is an agency of the State, it is also, under our Constitution, to some extent at least, an autonomous, self-governing political entity with respect to *exclusively* local affairs, in the performance of which func-

tions it is distinguished from its creator, the State, and for its acts and obligations when acting in purely local matters the State. is not responsible. This, as we have seen; must be conceded in order to sustain the validity of county bonds. See Jackson Lbr. Co. v. Walton County, 116 So. R. 771; O'Connor v. City of Fon du Lac, 85 N. W. R. 327; Rathbone v. Wirth, 45 N. E. R. 115; People v. Hurlburt, 24 Mich. 44, 89, 93, et seq.; 9 Am. R. 103, the principles in which cases we approve generally, though in view of the plenary power of the legislature over cities, we declined in State v. Johns, 109 So. R. 228, to apply these principles to defeat a legislative appointment of certain city officers. Cooley, Taxation (4th Ed.) Sec. 415; Cooley, Const. Lim. (7th Ed.) p. 243, 265, 334; 1 McQuillen Munc.-Corp. Sec. 164, et seq.

Article 9 of the Constitution relates to taxation and finance. Sec. 2 thereof ordains that "the legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State." Having thus prescribed the means for defraying expenses of the State, attention is given to the needs of local governmental subdivisions.

Of course a county has no inherent power to impose taxes. The power, if it exists, must be derived from the State. Sec. 5 of Art. 9 provides that "the legislature shall 'authorize' the several counties and incorporated cities and towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes * * *. The legislature may also provide for levying a special capitation tax 'and a tax on licenses.' But the capitation tax shall not exceed one dollar a year and shall be applied exclusively to common school purposes." Thus the means is provided for raising revenue

for local county and municipal purposes in the performance of local functions.

It is clear, therefore, that our Constitution contemplates that an exclusively State purpose must be accomplished by State taxation; an exclusively county purpose, in which the State has no sovereign interest, by county taxation. Chicago, etc., R. R. Co. v. State, 108 N. W. R. 557; Cooley, Taxation, Sec. 314. See Advisory Opinion, 13 Fla. 687; State v. Burns, 38 Fla. 367, 21 So. R. 290. In State v. Dickson, 44 Fla. 623, 33 So. R. 514, this Court held that the legislature could not compel the levy of an *ad valorem* county tax for an exclusively State purpose. In Jordan v. Duval County, 68 Fla. 48, 66 So. R. 298, the issue of county bonds and the levy of a county *ad valorem* tax to erect an armory was approved by this Court because the legislative act "authorized but did not command" the issuance of the bonds, and in the act the legislature reasonably recognized in the circumstances of the erection of that armory a dual State and county purpose. See also County Comrs. v. Board of Pilot Comrs., 52 Fla. 197, 42 So. R. 697; 120 A. S. R. 196; Duval County v. Jacksonville, 36 Fla. 196, 18 So. R. 339; Cooley, Taxation, (2nd Ed.) Sec. 314. In A. C. L. v. Lakeland, on petition for re-hearing, 115 So. R. 672, 686, it was said: "A particular district or locality can not lawfully be taxed for the cost of an undertaking which results *only* in a general benefit." But a single project in some instances may constitute a dual purpose and therefore may justify a levy of taxes appropriate to the purpose. See Skinner v. Henderson, 26 Fla. 121, 7 So. R. 464; Lewis v. Leon County, 91 Fla. 118, 107 So. R. 146; Jackson Lbr. Co. v. Walton County, 95 Fla. 632, 116 So. R. 771; Rushton v. State, 75 Fla. 422, 78 So. R. 345; Stuart v. DeLand, etc., 71 Fla. 158, 71 So. R. 32. And a local tax may be imposed by competent

authority where the project is essentially a local one, though there may be some incidental and indirect general benefit. See Cook v. Port of Portland, 27 Pac. R. 263; 13 L. R. A. 533; State v. Clausen, 163 Pac. R. 744; Steiner v. Sullivan, 23 N. W. R. 286; Cooley, Taxation (4th Ed.), Sec. 315; see also Hunter v. Owen, 80 Fla. 812, 86 So. R. 839. And when a project is to a large extent of general benefit, but also especially and peculiarly benefits a local community, the local community may be taxed for a just proportion of the cost appropriate to such special or peculiar benefits. Cooley, Taxation (4th Ed.), Sec. 315; State v. Williams, 35 Atl. R. 24. It has also been held by high authority that in such a case, and when the circumstances as to the coordinate local benefit justifies it, the local community may be taxed for the whole cost. Mobile v. Kimball, 102 U. S. 691, 26 L. Ed. 238. But see Hasbrouck v. Milwaukee, 13 Wis. 37, a well reasoned opinion to the contrary. See also Cooley, Taxation (4th Ed.), Sec. 428.

If, however, the Legislature undertook to impose a tax upon the people of one county alone to pay the salary of the State officers created by Articles 3, 4 and 5 of the Constitution, or if the State undertook to tax a single county alone for the erection of a State building such as a State Capitol or State Prison, or State Insane Asylum, there would be no hesitation in saying there was no such power in the Legislature, because such a tax would at least violate the constitutional guaranty of equal protection of the law. See Ryerson v. Utley, 16 Mich. 269. Likewise, if a tax were imposed upon the people of the whole State to pay the salary of local officers of a given county, or to erect a building to serve a public purpose of a purely local nature, and wholly unrelated to any governmental purpose or function of the State, as for instance a county poor farm or a stockade for the confinement of county prisoners, or a

county hospital authorized by statute as a county purpose, no one would seriously deny that the collection of such a tax would flout the clear intendment, if not the letter, of our Constitution. Steiner v. Sullivan, 77 N. W. R. 286; Cooley, Taxation (4th Ed.) Sec. 318.

There is no difference in principle between a tax of the nature just mentioned and a tax imposed as a *State* tax throughout the entire State to pay the bonded obligations of the several counties incurred in the building of roads and bridges, when the building of such roads and bridges has been previously undertaken *and consummated* solely as a county (or district) project, and the status of such bonded obligations previously fixed as exclusively county (or district) obligations. This is true even though the *building* of public roads may constitute a dual State and county function in appropriate instances, and even though the roads and bridges so constructed *as county or district projects* may also be beneficial to the State.

On the question of the so-called "flexibility" of our Constitution to meet the changes wrought by modern conditions, it is pertinent to note here the views of the Supreme Court of the United States expressed in Euclid v. Ambler Invest. Co., 272 U. S. 365, 71 L. Ed. 303. It was there said with reference to the Federal Constitution: "While the meaning of constiutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. * * * Regulations, the wisdom, necessity and validity of which as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." To that wholesome doctrine we

subscribe. But neither the present necessity for a unified system of "through" roads to accommodate the demands of modern travel by automobile, nor a desire to render State aid to local subdivisions in the payment of bonded obligations incurred by them in constructing local roads already completed as local projects but which the State is willing to now accept as beneficial to the State wide system of roads, affords any justification for centralizing the *powers* of local taxation in a manner not contemplated by the Constitution, nor for ignoring constitutional barriers separating State and local government. The necessity for such a system of highways may be conceded, and additional revenue for such local subdivisions may be imperative, but those objects must be accomplished by the means contemplated by our Constitution and by methods consistent with the fundamental principles of government thereby ordained. The Constitution can not be made to mean one thing at one time, and another at some subsequent time. State v. Butler, 70 Fla. 102, 69 So. R. 771.

As the second and third gas taxes are county taxes, it next becomes pertinent to consider whether the Legislature may directly levy, or may *compel* the levy by local officers, of a county tax. By "county tax," as used throughout this opinion, is meant a tax for an *exclusively* county purpose in which the State has no sovereign interest or responsibility, and which has no connection with the duties of the county in its relation to the State.

We do not intend in this opinion to decide upon any question relating to the power of the legislature to directly impose certain local district taxes, as for instances the Everglades Drainage District or districts formed by local petition. There being no specific limitation in the Constitution upon the formation of such districts, the direct levy of taxes of that character rests in part upon principles

other than those now under consideration. Lainhart v. Catts, 73 Fla. 735, 75 So. R. 47.

In Cheney v. Jones, 14 Fla. 587, the Court had under consideration the limitations upon the legislature in imposing *State* taxes. It was distinctly held that in levying *State* taxes the legislature is limited to the purpose of defraying the expenses of the State. In that case the Court was not concerned with the power of the legislature to directly impose taxes for county purposes. Moreover, the Court in that case had under consideration the imposition of *ad valorem* taxes *only*. What is said there has reference only to an *ad valorem* tax imposed as a State tax. When it is said therein that the section under consideration (now Sec. 2 of Art. 9) prescribes how far the legislature may go "in levying taxes," the Court necessarily meant "in levying *ad valorem* taxes for State purposes." No question concerning an excise tax was presented, so the Court did not concern itself with that matter, nor with the provisions of the Constitution with reference thereto. We again affirm what was said in Cheney v. Jones as applied to the character of taxation there under consideration, namely, an *ad valorem* tax for State purposes, levied under Sec. 2 of Art 9 of the Constitution.

Here, however, we are concerned with an excise or license tax, levied as a county tax. We must, therefore, consider other provisions of the Constitution, including Sec. 5 of Art. 9.

In Article 8 of the Constitution the people recognized counties as "legal political divisions of the State" and provided for county officers. In Sec. 2 of Art. 9 the Constitution requires the legislature itself to provide revenue sufficient to defray expenses of the State. In Sec. 5 of Art. 9, which pertains to the levy of taxes to meet the expense of local county (and municipal) government the

42

command of the Constitution is that "The legislature shall 'authorize' the several counties and incorporated cities or towns in the State to 'assess and impose' taxes for county and municipal purposes, and for no other purpose."

It is urged that in the language of Sec. 5 of Art. 9 that "the legislature shall 'authorize' the several counties," etc., the only limitation implied is that "when the legislature authorizes counties to assess and impose taxes, such authorization shall be limited to an authorization to assess and impose such taxes for county purposes only," and that it "does not imply a limitation upon the power of the legislature to directly impose" taxes on the counties for local county purposes.

When the language of Sections 2 and 5 of Art. 9 is contrasted, however, and is considered in the light of our institutions of government and in the light of the construction placed upon what is now Sec. 2 of Art. 9 in Cheney v. Jones, *supra,* it is our judgment that the framers of the Constitution intended to and did withhold from the legislature the power to directly levy, or to compel a county to levy, a local county *ad valorem* tax for an *exclusively* local purpose as already defined herein. Local administration of *exclusively* local affairs, that is, affairs in which the State has no sovereign interest as such, is undoubtedly contemplated by our Constitution. To withhold the co-ordinate power of local determination as to taxation in matters of *exclusively* local concern, would leave little of local government. See Cooley, Taxation (4th Ed.), Sec. 416, et seq.; Jackson Lbr. Co. v. Walton County, 116 So. R. 771; People v. Mayor, etc., 51 Ill. 17; Pope v. Phifer, 3 Heisk (Tenn.) 682, 700; Morgan v. Schusselle, 81 N. E. R. 814; People v. Common Council of Detroit, 28 Mich. 228; Glades v. Board of Water Commissioners, 122 Mich. 366; People v. Village of Pelham, 109 N. E. R. 513; State

v. Omaha, 200 N. W. R. 871; 46 A. L. R. 602, 610; Cooley, Const. Lim. (7th Ed.), p. 337.

We wish to be clearly understood, however, that the view just expressed with reference to local county taxes is confined to the levy of *ad valorem* taxes for an *exclusively* local purpose, that is, a purpose in which the State has no sovereign interest or responsibility and which has no connection with the duties of the county in its relation to the State. To the rule that the legislature has no power to levy or compel a county to levy a county *ad valorem* tax there are exceptions as well established as the rule itself, some of which it will be well to notice here in order to avoid any misunderstanding of the scope of the rule just stated. Amongst those exceptions are:

(1) When the purpose of the tax is one of both local and general concern, that is, a dual purpose, such as the support of public schools, the protection of public health, safety and morals, and the construction of roads and bridges, such roads and bridges constituting parts of the State system of highways, as to which the State has plenary control, but the "construction" of roads and bridges as parts of the State system of highways is to be distinguished from the *payment* of county or district obligations the proceeds of which were expended for roads and bridges already constructed as purely local projects. So this Court has approved an act of the legislature *requiring* a board of county commissioners to purchase land for the erection of a court house, since, as explained by Mr. Justice BROWN in a concurring opinion, "it is of such importance to the State that there be a reasonably adequate court house in each county that it (the building of a court house) is not *exclusively* a county purpose." State v. Tyler, 116 So. R. 760. See also Apgar v. Wilson, 116 So. R. 78; City of Chicago v. Manhattan Cement Co., 53 N. E.

R. 68; 45 L. R. A. 848; 69 A. S. R. 321; Richmond v. Pace, 103 So. E. R. 647; Rogers v. Bass, 168 Pac. R. 212.

(2) When the purpose of the tax is to require the county to fully and properly perform its duty as "a legal political division of the State," that is, as an agency in State government. Obviously, the State possesses the power to prevent a condition of local insurgency in government. No local community has the inherent right to decide for itself whether it will or will not bear its legitimate share of State burdens in matters pertaining to general government, and the State could not confer such a right. The Legislature may therefore directly impose a tax, *ad valorem* or excise, for the sole purpose of enforcing legitimate contribution of the several counties to the general expense of the State for State purposes, even when the purpose is exclusive of any element of local purpose.

(3) When the imposition of such a tax is necessary to compel the county to fulfill a lawful obligation resting upon it in consequence of corporate action taken by virtue of authority derived from the sovereign State, as for instance the payment of its bonds.

In each of the foregoing excepted cases, (1) to (3), the State has a sovereign interest in the purpose for which the tax is levied. Consequently the purpose is not exclusively a local purpose, and such a tax would not be *exclusively* a local or county tax. Therefore the State possesses ample sovereign power in such cases to directly levy such a tax, *ad valorem* or excise, or to compel its levy by local officers. In such cases in which the State also has a sovereign interest, the people to be taxed have no absolute right to a voice in determining whether the tax shall be levied, save as they may be heard through their representatives in the Legislature.

There yet remains to be considered a fourth exception, in the case of excise or license taxes, to the rule inhibiting the direct levy by the State of a county tax.

Having provided in Sec. 2 of Art. 9 for the raising of revenue to meet the expenses of the State, under the language of which Section the Legislature could clearly impose excise or license taxes, as well as *ad valorem* taxes, for a State purpose; and after having provided in Sec. 5 of Art. 9 that the Legislature shall "authorize" the several counties to "assess and impose taxes" for county purposes, which also would embrace both *ad valorem* and excise taxes, there follows almost immediately in the same Section the further provision: "The *Legislature* may *also* provide for levying a tax on licenses," that is, excise taxes. (Italics supplied.) It is significant that the latter provision is found in Sec. 5 of Art. 9 relating to county and municipal taxation, provision having already been made for raising revenue for State purposes, under which excise as well as *ad valorem* taxes could be imposed for State purposes. It is also significant that although the capitation tax, authorized in the same sentence, is required to be applied exclusively to a designated purpose, no purpose of application was specified for license taxes, except of course that it must necessarily be applied to a county purpose if levied as a county tax, because in the levy of *State* taxes the Legislature is confined by Sec. 2 of Art. 9 to State purposes.

We can not assume that the framers of our Constitution used words idly. We must impute some purpose to the language found in Sec. 5 of Art. 9 that "the *Legislature* may *also* provide for levying a tax on licenses." The clause was designed to accomplish some object. It is our judgment that by virtue of the quoted provision found in Sec. 5 of Art. 9 the Constitution contemplates not only that

the Legislature may "authorize" the several counties to assess and impose license or excise taxes, but the "Legislature" may "also" provide for levying excise or license taxes. This broad authority not having been confined to the levy of such taxes for State purposes, then in view of the inherent power of the State to levy all taxes not inhibited by State of Federal Constitutions the authority extends to the levy by the Legislature of such taxes for local county purposes. See Amos v. Gunn, 84 Fla. 285, 94 So. R. 615.

If that was not the object of the quoted provision we must disregard it, for it would be utterly superfluous, because under Sec. 2 of Art. 9 the Legislature could levy an excise tax for State purposes, and under the first portion of Sec. 5 of Art. 9 the Legislature could "authorize" the levy of such a tax by local officers for local purposes. Unless, then, the purpose of the quoted phrase was to recognize the authority of the Legislature to "also" impose excise taxes for local county purposes, what was its object? The practice has been followed since 1913 with reference to occupational license taxes, see Chap. 6421, Acts of 1913, Sec. 804 R. G. S. 1920; Sec. 1051, C. G. L. 1927. See also Chap. 6881 and 6883, Acts of 1915, levying license taxes on the operation of automobiles, the first being a county tax, the second a State tax.

The view here expressed as to the purpose of the phrase under consideration, as well as the fact that it was intended to embrace all license or excise taxes and not merely occupational license taxes, is sustained by the history of the phrase in the Constitutional Convention of 1885, which will be found in the proceeding of that Convention, on pages 186, 269, 273 to 280, and 350.

The Legislature may "provide" for levying such excise taxes either by a direct imposition thereof or by delegated

authority to local officers to levy such tax for a local purpose. With reference to *excise* taxes, the choice of method rests with the Legislature. See Canova v. Williams, 41 Fla. 509, 27 So. R. 30, holding that the Legislature may delegate to cities the authority to impose and collect license taxes. The rule would be the same as to counties.

Since the second and third gas taxes are excise taxes, and since these taxes may be regarded as county taxes for county purposes, and since the authority of the Legislature to directly impose such a tax for county purposes is expressly recognized by the quoted provision of Sec. 5 of Art. 9, we conclude that the levy of said second and third gas taxes as county taxes is valid, and violates no principle of local self government contemplated by the Constitution. The administration of such taxes by the Board of Administration provided by Senate Bill One, will be considered later.

Second, as to the apportionment of the second and third gas taxes amongst the several counties:

We have demonstrated that these taxes are imposed as county, not State, taxes, and we so hold.

There is no constitutional requirement that taxes levied as State taxes, that is, for general "expense of the State," shall be expended or disbursed in the particular community where collected. The Legislature has wide, if not plenary discretion in the apportionment and application of the proceeds of a State tax, except as restrained by the Constitution. State v. Hauge, 164 N. W. R. 289; L. R. A. 1918 A 522; Cooley, Taxation (4th ed.), Sec. 1813. State taxes imposed as such and collected from all the counties may properly be expended in the construction of a State road located wholly in one county, or in only a few counties, or upon a State building located wholly in one county.

It is settled also that intrinsic equality and uniformity, essential in the imposition of *ad valorem* taxes, is not indispensable in the imposition of excise taxes. Hiers v. Mitchell, 116 So. R. 81; Jackson v. Neff, 64 Fla. 326; 60 So. R. 350; Ex parte Shaw, 157 Pac. R. 900. But in the imposition of excise taxes there must be geographic uniformity throughout the taxing district to which the particular tax applies, and such a tax can neither be laid nor apportioned amongst different taxing districts so as to in effect tax the people of one taxing district for the benefit of another taxing district for a purpose in which the people of the district taxed have no concern. Cooley, Taxation, (4th Ed.) Secs. 310-318, 348 et seq.

The legislature may impose a county excise tax in one county and not in another, but if imposed as a county tax the proceeds of such tax would be county revenue, and such tax must be uniformly imposed throughout the county in which the tax is levied. The legislature may impose an excise tax on one privilege, or class of privileges, and not on another, or at a higher rate on one privilege than on another. The legislature has no power, however, to impose even an excise tax on the people of the whole State to attain a purely and exclusively county purpose. Conversely, the legislature has no power to impose an excise tax upon the people of one county alone, or any group of counties less than all, to defray a general State expense, from which such counties receive no special benefits not enjoyed in common by all.

As the second and third gas taxes are county taxes, the territorial taxing unit is the county. The apportionment of the revenue from both these taxes must therefore be to the several counties in the proportion collected therein respectively, and not in proportion to the bonded indebtedness. To apportion such revenue according to the bonded

indebtedness of the several counties would result in some counties receiving less than is collected in those counties, while other counties would receive much more than is collected therein, so that the former would be compelled to contribute to the debts of the latter, thus denying the equal protection of the law, the purpose of the tax being to pay off the bonds of the several counties, and the bonded indebtedness of the several counties being not in the same relative proportion as the sales of gasoline therein. An "equal" division amongst the several, counties would lead to the same result, when the tax is a county tax, a greater amount being collected in some counties than in others.

When county funds have been raised by a county tax imposed for revenue purposes, the legislature has no such control over the funds so raised that it may take the moneys so collected from the citizens of one county and divert it to the benefit of the citizens of another county, even though the tax was imposed directly by the legislature. There is no principle of which we are aware which sanctions the doctrine that it is within the taxing power of the legislature to compel one county to contribute to the debts of another. Under our system of constitutional government, arbitrary or unlimited power is not committed to any branch of the State government, legislative, executive or judicial. Even though the legislature may impose excise taxes for county purposes, it can not take the revenue thus raised in one county for county purposes and appropriate it to pay the debts of some other county, upon the assumption that as the revenue is public funds raised by act of the legislature itself, it must be at the legislature's absolute disposal. If so, the principle that taxation and representation go together will have vanished. See Yemhill v. Foster, 99 Pac. R. 286; Simon v. Northrup, 40 Pac. R. 560; Hampshire v. Franklin, 16 Mass. 83; In

re: Lands in Flatbush, 60 N. Y. 398; Edwards v. Davis, 24 So. W. R. 359; Sharpless v. Mayor of Philadelphia, 21 Pa. St. 147; 59 Am. Dec. 759; Citizens Savings Ass'n. v. Topeka, 20 Wall (U. S.) 655; 22 L. Ed. 455; Terrett v. Taylor, 9 Cranch (U. S.) 43, 3 L. Ed. 650; Merriwether v. Garrett, 102 U. S. 472; 26 L. Ed. 197; Mainstee Lbr. Co. Twp. of Springfield, 52 N. W. R. 468; Ryerson v. Utley, 16 Mich. 269; Cooley, Taxation (4th Ed.), Sec. 1817, 1818; 26 R. C. L. 41, et seq.

In State v. City of Stuart, 97 Fla. 69, 120 So. R. 335, this Court speaking through Mr. Justice BROWN, held that even in view of the plenary power of the legislature over cities under Constitution, Art. 8, Sec. 8, the legislature had no power to arbitrarily enlarge the limits of a city so as to compel the residents of contiguous but essentially rural territory to contribute to the debts and cost of operation of the municipality.

In Cooley on Taxation (4th Ed.), Sec. 314, it is said:

"An Act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of certain sums by one portion or class of people to another. This principle has met with universal acceptance and approval because it is as sound in morals as it is in law."

Nothing said herein conflicts with what was said in the concluding paragraph of the opinion in State v. Johnson, 71 Fla. 363, 72 So R. 477. When Chap. 6883 and Chap. 6881, Acts of 1915, there under consideration, are construed *in pari materia*, the result is that the fifteen per cent of all automobile license taxes collected, which was the subject of Chap. 6883, and which was required to be paid to the State Treasurer for the maintenance of the State

Road Department, is levied and collected as a State tax. That fact completely distinguishes that tax from the taxes here under consideration.

As against this view as to the apportionment of the third gas tax, it is urged that although these taxes may be county taxes, and although they may be ostensibly levied upon and paid by the retail dealer in gasoline, they are really taxes upon the consumer (See Panhandle Oil Co. v. State of Mississippi, 277 U. S. 218, 72 L. Ed. 857; Foster Co. v. Graham, 285 So. W. R. 570; 47 A. L. R. 917), and hence in the ultimate analysis these taxes constitute a tax upon the consumption of gasoline; that although gasoline may be bought in one county, the same gasoline is used indiscriminately over a territory embracing, perhaps, many counties. Therefore, it is contended, there is no justification in fixing the situs of the tax, for purposes of apportionment, in the county in which the gasoline is bought, because it is consumed in the indiscriminate use of roads in other counties.

In this respect, the use of gasoline is reciprocal. Gasoline purchased in Leon County might be used in several counties along Road No. 1 to Duval County. Conversely, gasoline purchased in Duval County might be used in Leon County, and in the intervening counties. The claim that principal termini counties would thus profit over intervening counties is largely dispelled by statistics of the State, which show that the proportion of gasoline purchased in the several counties coincides substantially with population.

Furthermore, all taxes on purchasable commodities are passed along to the consumer in one form or another. Regardless of whether the tax is ultimately paid by the dealer or the consumer, it is a tax either on the privilege of the dealer to sell, or on the privilege of the customer to pur-

chase. In either event the *privilege* is exercised wholly in the county where the sale and purchase occurs, even though the consumption of the commodity so purchased may sometimes occur in other counties. But that does not alter the situs of the tax for the purpose of distribution. In Amos v. Gunn, 84 Fla. 285, 94 So. R. 615, a tax of this character was construed as a tax on the sale of gasoline.

No one would deny that the county in which a county occupation license tax is collected (which is levied directly by the legislature, see Sec. 1051 Rev. Gen. Stats. 1927), is a revenue which that county must be allowed to retain, whether it be collected locally in the county, or by State officers for the benefit of the county. Such taxes are levied upon the privilege of conducting the several businesses and occupations in the respective counties. The merchant, especially the wholesale merchant, exercises the privilege of selling his wares in a given county, but these wares are frequently used and consumed in other counties. The shoe merchant sells shoes that are worn upon the streets and roads of other counties and cities; the automobile dealer sells automobiles which are used in and upon the roads of other counties; the grocer sells groceries which are consumed in other counties, yet it would not be seriously contended that the county of situs, where the privilege of sale, or of carrying on the business is exercised, should divide the revenue so derived with other counties into which the commodities may sometimes be taken for consumption or use.

Though the revenue derived from gasoline taxes has been used largely for constructing roads, and though it is peculiarly appropriate for that purpose, nevertheless the primary basis of the tax in its present form is not as a tax upon the use of roads, but upon the privilege of selling gasoline. This tax must be paid regardless of whether the

gasoline is to be used in propelling an automobile along the roads, or in a motor boat, an aeroplane, or a stationary engine, for which latter purposes a substantial percentage of the gasoline sold, and on which this tax is paid, is used by fisheries, sawmills, and the like. So strictly speaking, it can not be said that the purpose of the tax is to place a tax on the use of roads, so as to justify its apportionment on that theory. A tax or toll might be imposed upon that privilege in appropriate cases, as on a mileage basis or otherwise (See Carley & Hamilton v. Snook, 74 L. Ed. (U. S.) 250) and different rules of construction and apportionment might apply to such a tax.

These gasoline taxes are not necessarily to be compared in this respect with automobile license taxes upon the operation of automobiles. The latter might be susceptible of construction as ultimately a tax upon the use of roads, though we do not now consider that question.

The distribution or apportionment of a tax, it is true, is in a sense separate from the levy, so that the invalidity of the apportionment may not necessarily affect the validity of the levy. Nevertheless, if the levy of a county tax is laid uniformly by the legislature, but the proceeds of the tax are arbitrarily apportioned without reference to the sums collected in the taxing units or districts in and for the benefit of which the taxes are collected (in this case the several counties), the result is as much a denial of uniformity and equal protection as though the levy itself was similarly lacking in uniformity.

In the opinion of the majority of the court, the distribution of the third tax upon the basis of relative bonded indebtedness of the several counties is invalid. We hold, therefore, under the specific provisions of the Act, as well as upon general principles of law, that the alternative method of apportionment provided in the Act, that is, in

the proportion to the amounts collected in the several counties, respectively, must be followed in apportioning the second and third gas taxes amongst the several counties.

The view of Mr. Justice WHITFIELD in this particular respect is that as the distribution in proportion to bonded indebtedness may be of doubtful validity, he therefore concurs in the holding here that the alternative distribution in proportion to the amounts collected in the several counties, as provided in the Act, be followed.

As to the apportionment of the fourth gas tax:

The apportionment of school taxes is, under our Constitution, a question *sui generis*. See State v. L'Engle, 40 Fla. 392, 400; 24 So. R. 539, 541; Constitution, Art. 12.

Sec. 7 of Art. 12 of the Constitution, as it has remained since the amendment adopted in 1894, is:

"Provision shall be made by law for the apportionment and distribution of the interest on the State School Fund, and all other means provided, including the special tax, for the support and maintenance of public free schools among the several counties of the State in proportion to the average attendance upon schools in the said counties respectively."

In 1926 Sec. 9 of Art. 12 was amended to read as follows:

"In addition to the tax provided for in Section 8 of this Article the County School Fund shall consist of the proportion of the interest of the State School Fund and of the one mill State tax apportioned to the county, all capitation taxes collected within the county and all appropriations by the Legislature which shall with all other County School Funds be appor-

tioned and distributed as may be provided by law and shall be disbursed by the County Board of Public Instruction solely for the support and maintenance of public free schools: Provided, that such apportionment and distribution shall be made by general law based upon some declared principle of classification to be determined by the Legislature.''

Sections 7 and 9 of Art. 12 must be construed together. Sec. 7, containing a mandatory method of apportionment of school funds has been modified, to the extent of the effective operation of the proviso embraced in Sec. 9 of Art. 12 as amended in 1926, but Sec. 7 of Art. 12 was not repealed by the adoption of the amendment of Sec. 9 of Art. 12 containing the proviso mentioned. The effect of the two Sections considered together, upon the question of apportionment of school funds, is that Sec. 9 of Art. 12 of the Constitution yields to the Legislature the authority by a proper statute to apportion school revenue ''by general law based upon some declared principle of classification to be determined by the Legislature.''

The chancellor has held that Sec. 3½ of Chapter 14573, Acts of 1929, constitutes such a law, and that the apportionment therein provided for, upon a basis of ''aggregate'' attendance in the several counties, must be followed in the distribution of two-thirds of the fourth gas tax.

Conceding that Chapter 14573, *supra,* is a general law as distinguished from a special law, and assuming but not deciding that the method of apportionment therein provided for school funds is upon a ''declared principle of classification'' as contemplated by the proviso in Sec. 9 of Art. 12, and further, whatever may be the effect of the provisions of Sec. 3½ of that Chapter upon the apportionment of the ''special revenue'' for school purposes in that

particular Act provided for, a question we do not now decide because it is not now presented, it is clear that the title of Chapter 14573, *supra,* which is:

"AN ACT Providing for the Raising of Special Revenue for the Purpose of Education in This State by Providing An Additional Tax Upon Gasoline; By an Ad Valorem Tax on all Real and Personal Property in the State and Appropriating All Interest Received on All State Monies on Deposit in the Various Banks of the State."

is not sufficient to embrace the provisions of Sec. $3\frac{1}{2}$ of that Act purporting to apportion and distribute "all funds in the State Treasury to the credit of the public free school fund." Wade v. Atlantic Lbr. Co., 51 Fla. 628, 41 So. R. 72.

It necessarily follows that by Chap. 14575, *supra,* (Senate Bill 5) the legislature has provided and appropriated revenue for public free schools as contemplated by amended Sec. 9 of Art. 12, but has made no effective apportionment thereof under the proviso of that Section. Therefore, the apportionment and distribution of two-thirds of the fourth gas tax must be "to the several counties of the State in proportion to the average attendance upon schools in said counties respectively" as provided in Sec. 7 of Art. 12 of the Constitution, such funds to be used in the several counties for county school purposes. It is unnecessary to specifically classify this tax to determine whether it is a State tax, or whether it is a county tax, as in either event its apportionment is controlled by the Constitution.

As to the remaining one-third of the fourth gas tax:

Of course, the legislature could impose a State excise tax for the construction of roads and distribute it

"equally" amongst the several counties, the sovereign State having complete control over its own revenue, save as limited by the Constitution. While the construction of roads may constitute a dual State and county function it also may properly constitute a county function only. It appears to us that when the legislature apportioned one-third of the fourth gas tax for "the construction of roads and bridges in the county to which it is apportioned" the legislature had in mind primarily the accomplishment of road building by the county as a county purpose, with reference to desirable local roads in the county, although these roads or some of them might also become parts of the State's system of highways. This leads to the view, and we hold that such one-third of the fourth gas tax is imposed as a county tax and must be apportioned amongst the several counties in the proportion collected in each county.

Third, as to the application of the revenue derived from these taxes:

As we have seen, the legislature may compel the imposition of local taxes for the purpose of requiring the fulfillment of obligations of counties or other local subdivisions of the State incurred through corporate action taken by virtue of authority derived from the State. The legislature may, therefore, direct the application of the revenue derived from the second and third gas taxes to the payment of county road and bridge bonds.

The legislature may also direct the levy of county taxes for the purpose of constructing and maintaining roads, such roads forming a part of the State's system of highways. The legislature may, therefore, direct the application of the one-third of the fourth gas tax to the "construction of roads and bridges in the county to which it is apportioned."

That the apportionment of this one-third of the fourth gas tax, as well as of the second and third gas taxes, must be to the several counties in the proportion collected therein, has already been pointed out.

The distribution and application of two-thirds of the fourth gas tax for schools is controlled by Constitution, Sec. 7, Art. 12, as already pointed out.

As to the application of the proceeds of the second and third gas taxes to the payment of special district roads and bridge bonds, after apportionment amongst the several counties in the manner already pointed out:

It is the view of the writer of this opinion, as well as of Mr. Justice ELLIS that the proceeds of the second and third gas taxes must be applied to the payment of county bonds only, and not to district bonds. It is true that the Constitution erects no specific barrier against the payment of district bonds by the county, as it does against the payment of county bonds, or other local bonds, by the State. There is no express limitation in the Constitution relating to the levy by the legislature of taxes for local district purposes. In the opinion of those members of the Court just above mentioned, however, it does not necessarily follow that the power of the legislature is transcendent in that respect.

Undoubtedly these district roads could have been originally constructed as county projects and with county funds. But they were not so constructed. The people of the districts voluntarily chose to construct them as district projects because they regarded them as of peculiar benefit to the people of the district. This was done without the consent or participation of the people of the other portions of the county. The construction of county roads is accomplished according to one recognized plan, the construction

of district roads according to another and essentially different plan. See State v. Walton County, 112 So. R. 630.

The due process and equal protection guarantees of the Constitution clearly imply that the burden of taxation to pay off an *existing* public *obligation* must be laid only upon those upon whom the obligation rests. In Cooley on Taxation (4th Ed.), Sec. 314, p. 653, it is said: "To any extent that one man is compelled to pay in order to relieve others of a public burden properly resting upon them, his property is taken for private purposes as plainly and as palpably as it would be if appropriated to the payment of the debts or the discharge of obligations which the people thus relieved by his payments might owe to private parties."

Here the district obligations have been voluntarily created and assumed by the people of the district alone, as a district obligation. The county at large is under no obligation to pay those bonds. They are district bonds. The second and third gas taxes are county taxes, and the proceeds county funds. To include district bonds in the application of the proceeds of the second and third gas taxes would be in effect to compel (not authorize) the people of the county at large to contribute, not to the construction of a road which might be a benefit to the county, but to the payment of an *existing* obligation which they have not created nor assumed but which rests upon a defined and established portion of the county only. I cannot assent to the plan of compelling the people of the county at large to contribute to an existing debt, established as a district debt, in the creation of which neither the people of the county at large, nor their chosen representatives, had any voice. See Stanley v. Jeffries (Montana) decided Nov. 29, 1929, 284 Pac. R. 134.

In State v. Brevard County, decided at this term, the Act "authorized" but did not "compel" the assumption by the county of district obligations. The action of the county officials of Brevard County in *voluntarily* taking over the district obligations under authority as distinguished from compulsion of the legislature, is tantamount to the people of the county, acting through their chosen representatives, the county commissioners, voluntarily assuming the district obligations, the legislature having declared the district roads to be county roads and beneficial to the county as such. In the case now before us, however, to apply the proceeds of the second and third taxes to the payment of district obligations would be *in invitum*, and therefore compulsory. The legislature might authorize the several counties to take over district bonds, the proceeds of which were expended for the construction of roads which constituted an appropriate county purpose, as it has done with reference to Brevard County by Chap. 13937, Acts of 1929. Having done so, if the county authorities then *voluntarily* assume the district bonds as a county indebtedness by substituting county bonds therefor, these latter bonds might participate in the application of the proceeds of the gas taxes if the legislature sees fit to remove the provision restricting participating bonds to those issued prior to April 1, 1929. This would not be an indirection. In the circumstances last named the people of the counties, through their chosen representatives, will have voluntarily assumed the indebtedness as for a purpose which is an appropriate county purpose in view of the character of the roads.

On the other hand, however, Mr. Justice WHITFIELD, Mr. Justice BROWN and Mr. Justice BUFORD are of the opinion that district bonds should be included in the application of these funds for the same reason stated in The

State of Florida v. The County of Brevard, decided at this term, these members of the Court being of the view that the legislature may direct as well as authorize the application of funds levied upon the subject, and for the purposes, and collected as in this case, since the taxes imposed are excise taxes and since the purpose for which the legislature may impose excise taxes is not limited in the Constitution, as already pointed out herein, so that the legislature may directly levy county excise taxes and direct the application of the revenue therefrom to the payment of district bonds in the several counties.

Therefore, the decree of the chancellor in this respect is reversed.

Fourth, as to the administration of these revenues through the Board of Administration:

In 1914 an amendment to Sec. 6 of Art. 8 of the Constitution was adopted. Prior to that amendment there had been a constitutionally recognized county treasurer in each county. Amongst other things, the amendment of 1914 abolished the office of county treasurer, and this language was inserted in the section:

"The legislature shall provide by law for the care and custody of all county funds and shall provide the method of reporting and paying out all such funds."

This commits to the legislature the broadest possible authority as to the "care, custody, reporting and paying out" of *all* county funds. It vests in the legislature the authority to create the Board of Administration provided in Senate Bill One, for the "care, custody, reporting and paying out" of such county funds. The authority of the board, so far as the county funds are concerned, extends no further. The board is the mere fiscal agent of the county for designated purposes. It has no authority to perform any of the discretionary functions with reference

to such funds which properly belong to local county officers.

The creation of the Board of Administration is not the re-creation of the office of county treasurer contrary to the intent of Sec. 6 of Art. 8 of the Constitution, as amended. No such office is created. The Act merely places additional ministerial duties upon certain State officers which do not interfere with the constitutional duties of such officers. See Whitaker v. Parsons, 86 So. R. 251.

In Cone v. Road Improvement District, 277 So. W. R. 544, sustaining the Harrelson Act in Arkansas, relied upon by appellants, the taxes there in question were regarded as State taxes. It was soundly held that "the sovereign has complete control over its revenue derived from taxation," and that the State might apportion such taxes to the several counties according to population and apply same as a gratuity to the payment of local obligations. In that case, however, there does not appear to have been presented to or considered by that court the vital question which confronts us in this case, namely, whether such application of State taxes would violate the intendment of constitutional inhibitions against the issuance of State bonds. In Martin v. Dade Muck Land Co., *supra,* we distinctly held that "the State can not directly or indirectly 'pay' such bonds (Everglades Drainage District Bonds) by State taxation without violation of Sec. 6, Art. 9 of the State Constitution." It is the latter proposition which leads us to the conclusion that the second and third gas taxes imposed by Senate Bill Five are imposed as county taxes, since the legislature is presumed to have intended a valid levy, which leads to the further conclusion that the revenue constitutes county funds and therefore must be apportioned as hereinabove set forth because the funds of one county cannot be diverted to pay the debts of another county.

Sec. 2453, Rev. Gen. Stats. 1927, requires that one-half of the funds realized from the county special road and bridge tax levied upon property in cities or towns shall be turned over by the county commissioners to such cities and towns to be used in repairing and maintaining the roads and streets thereof. In Duval County Commissioners v. City of Jacksonville, 36 Fla. 196, 18 So. R. 339, and subsequent cases, it was held that such requirement was not in conflict with Sec. 5 of Art. 9 of the Constitution as being a diversion of county revenues to other than county purposes. That holding rests upon the reason that the streets of a municipality, in appropriate instances, and for purposes of maintenance, may constitute public roads of the county of which the municipality is a component part. All streets are highways, but all highways are not necessarily streets. In view of the plenary control of the legislature over streets and highways, and in view of the wide discretion committed to the legislature in prescribing county purposes, the legislature, for the purpose above stated, may, and has, adopted county aid in the maintenance of city roads and streets located in the county as a legitimate county purpose, for the reason that such streets serve both a county and city purpose. Such was also the controlling reasoning in the Arkansas case of Sanderson v. City of Texarkana, 146 So. W. R. 105. Nothing said in this opinion with reference to the apportionment and application of the county revenues here involved conflicts with or alters the views expressed by this Court as to the validity and operation of Sec. 2453, *supra*.

To recapitulate:

We hold:

1. The purpose of the second and third gas taxes is not to construct roads, but to pay off existing county and district bonds.

2. The legislature has no power to levy a State tax for the purpose of paying county or district bonds. If levied as State taxes, the second and third gas taxes would be repugnant to the constitution and their levy void.

3. The second and third gas taxes, as well as one-third of the fourth gas tax, are held to be county taxes, and the levy thereof as such is valid. The revenue from these taxes becomes county funds.

4. The apportionment of the revenue from the third gas tax in proportion to the bonded indebtedness of the several counties is invalid. Apportionment of the revenue from the second, third and one-third of the fourth gas tax must be to the several counties in the proportion collected therein respectively.

5. The application of the second and third gas taxes to the payment of county and district road bond indebtedness, after apportionment to the several counties as above stated, is valid. The application of one-third of the fourth gas tax to the construction of roads in the county is valid.

6. The apportionment provided for school funds in Sec. 3½ of Chap. 14573, *supra*, on a basis of "aggregate days attendance" in the several counties does not apply to the distribution of that portion of the fourth gas tax devoted to school purposes. The revenue from two-thirds of the fourth gas tax levied by Senate Bill Five must be apportioned to the several counties "in proportion to the average attendance upon schools in the said counties respectively," as provided by Sec. 7, Art. 12, of the Constitution.

7. Creation of the Board of Administration by Senate Bill One is valid, but the authority of that board to administer county revenue arising from the second and third gas taxes, is confined to the "care, custody, reporting and paying out" of such county funds.

8. Any surplus funds arising from the second and third gas taxes and to the credit of any county, after apportionment as hereinabove pointed out, should be remitted to such county to be used for the construction and maintenance of roads and bridges therein.

In the chancery cause, the decree appealed from is affirmed in part and reversed in part, and the cause remanded for further proceedings consistent with this opinion.

In the *quo warranto*, the demurrer to the information is sustained.

It is so ordered.

WHITFIELD, ELLIS, BROWN AND BUFORD, J. J., concur.

ERNEST AMOS, as Comptroller of the State of Florida, and W. V. KNOTT, as Treasurer of the State of Florida, *Appellants*, v. JOHN E. MATHEWS, *Appellee.*

THE STATE OF FLORIDA, on the relation of FRED H. DAVIS, Attorney General of said State, v. DOYLE E. CARLTON, as Governor, and MEMBERS OF THE BOARD OF ADMINISTRATION, and ERNEST AMOS, as Comptroller, et al.

Division A.

TERRELL, C. J.—The extraordinary session of the legislature for 1929 enacted Senate Bill One, which is now Chapter 14486, Laws of Florida, and Senate Bill Five,